IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

RHEA YOUNG,

Plaintiff,

v.

MONTGOMERY COUNTY, a municipality;
COMMISSIONERS COURT OF MONTGOMERY COUNTY;
MARK J. KEOUGH, in his individual capacity;
ROBERT C. WALKER, in his individual capacity;
RITCH WHEELER, in his individual capacity; and,
MATT GRAY, in his individual capacity.

Defendants.

Case No. 4:25-cv-4089

# COMPLAINT

Before it was known as Independence Hall, the second floor of the Pennsylvania State House was home to our nation's first public library. Steered by Benjamin Franklin, The Library Company of Philadelphia provided books to those who would otherwise not be able to afford them, and it fed early revolutionaries who were hungry for treatises on history, politics, and a quixotic governmental system called "democracy." To this day, public libraries, their shelves, and the librarians who tend to them offer us equal access to our nation's most valuable and enduring resource: our right to self-determination.

Notwithstanding the dangers of totalitarian thinking to a functioning democracy, local and state governments are increasingly being used as instruments of retribution against those who oppose censorship or object to government-imposed thought orthodoxy in politics, nationalism,

religion, or other contested and fundamental matters in society.[1] Across the country, librarians are being fired for opposing censorship or for simply supporting the very communities that censors seek to silence. These firings are part of a coordinated, escalating effort to silence dissent and enforce ideological conformity in public institutions. These librarians are the canaries in the coal mine of our democracy.

This case involves one such canary: Rhea Young, a former county librarian, who had the courage to stand up to government officials when they sought to malign historically marginalized community members and perspectives. In 2023, Ms. Young was working as Director of the Montgomery County Memorial Library System in Conroe, Texas, when the Defendant Montgomery County Commissioners Court, the County's chief legislative and executive body, aligned itself with a small but vocal group of anti-LGBTQ+ activists. These activists demanded the removal of books that did not conform to their narrow partisan or political views.

Rather than defend the Library System's longstanding policies of freedom of speech and thought, the members of Defendant Commissioners Court used their official authority to pressure Ms. Young to censor materials and spread a message of opprobrium. Ms. Young refused, instead upholding library policy and protecting access to diverse viewpoints. In her personal capacity, she spoke out against the rising tide of censorship and the discriminatory, unconstitutional nature of

---

[1] Recognizing that the most impactful books are often the most vulnerable to censorship, the United States Supreme Court ruled a lifetime ago that the First Amendment forbids local governments from "remov[ing] books from school library shelves simply because they dislike the ideas contained in those books and seek by their removal to 'prescribe what shall be orthodox in politics, nationalism, religion, or other matters of opinion.'" *Bd. of Educ., Island Trees Union Free Sch. Dist. No. 26 v. Pico*, 457 U.S. 853, 872 (1982) (quoting *W. Virg. Bd. of Educ. v. Barnette*, 319 U.S. 624, 642 (1943)). Although the claims in this case are not ones in which the Supreme Court's *Pico* analysis is implicated given the nature of this action, the Court's observations are nevertheless telling: censorship is a fundamental attack on the individual rights and liberties of citizens of this country, and a threat to democracies everywhere.

the book challenges, and publicly supported the rights and dignity of LGBTQ+ individuals, including her own child, who is transgender. Her termination was a direct response to her constitutionally protected speech and advocacy, in clear violation of federal law.

## JURISDICTION, VENUE, AND PARTIES

1. This action is authorized and instituted under the Constitution and laws of the United States pursuant to Title VII of the Civil Rights Act of 1964 42 U.S.C. § 2000e *et seq.* and 42 U.S.C. §§ 1981(a), 1983, and 1985. Subject-matter jurisdiction is conferred on this Court pursuant to 28 U.S.C. §§ 1331, 1343. Jurisdiction supporting Plaintiff's claim for attorneys' fees and costs is conferred by 42 U.S.C. § 1988.

2. Venue is proper in the Southern District of Texas pursuant to 28 U.S.C § 1391(b). All Defendants reside within and/or perform official duties within the Southern District of Texas. This Court, accordingly, has personal jurisdiction over each Defendant.

3. At all times relevant hereto, Plaintiff Rhea Young was a citizen of the United States and a resident of the State of Texas.

4. Defendant Montgomery County is a municipality in the State of Texas, which employs over 500 employees.

5. The Montgomery County Memorial Library System ("MCMLS" or "Library System") is one of Defendant Montgomery County's departments. The Library System's finances are controlled as revenues and expenditures within the county budget, and its employees are county employees. The Library System is comprised of eight branches and has about 165 employees, including about 154 full-time employees.

6. Defendant Montgomery County performs official functions related to public libraries through Defendant Commissioners Court of Montgomery County ("Commissioners Court").

7. Defendant Commissioners Court of Montgomery County is the local governing body responsible for conducting the general business of the county, and it serves as both the legislative and executive branches of the county government. The Commissioners Court adopts the county's budget and tax rate, approves county purchases, sets salaries and benefits, exercises its exclusive authority to authorize contracts, and establishes, maintains, and oversees the Library System.

8. Defendant Mark K. Keough has served as the elected County Judge and Presiding Officer of Defendant Commissioners Court of Montgomery County since 2019. He is a resident of the Southern District of Texas. Defendant Keough is assisted by his staff, including, Chief of Staff (Jason Millsaps), Deputy Chief of Staff (Jason Smith), Government Relations Manager (Jean Mann), and Administrative Assistant (Kimberly Sutton).

9. In exercising authority over the Library System, Defendant Commissioners Court of Montgomery County authorizes Defendant Keough to act as a final policymaker.

10. In addition to the county judge, Defendant Commissioners Court is comprised of four county commissioners, each elected by voters of one of the county's four precincts. The relevant history of these four county commissioner positions is as follows:

a. **Precinct One Commissioner**: Robert C. Walker (2021 to present)

b. **Precinct Two Commissioner**: Charlie Riley (2015 to present)

c. **Precinct Three Commissioner**: James Noack (2013 to 2024), Ritch Wheeler (2025)

d. **Precinct Four Commissioner**: James Metts (2019 to 2022), Matt Gray (2023 to present)

11. At all times relevant hereto, Defendant Robert C. Walker was the Precinct One Commissioner of Defendant Commissioners Court of Montgomery Texas. He is a resident of the Southern District of Texas.

12. Since January 2025, Defendant Ritch Wheeler has been the Precinct Three Commissioner of Defendant Commissioners Court of Montgomery County, Texas. He is a resident of the Southern District of Texas.

13. Defendant Matt Gray has been the Precinct Four Commissioner of Defendant Commissioners Court of Montgomery County, Texas from January 2023 to present. He is a resident of the Southern District of Texas.

## ADMINISTRATIVE EXHAUSTION

14. Rhea Young filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC").

15. The Charge of Discrimination was timely filed within 300 days of the discriminatory and retaliatory acts complained of therein.

16. The Charge of Discrimination included allegations under Title VII of the Civil Rights Act of 1964 for discrimination based on race, color, sex, religion, national origin; hostile work environment; and retaliation based on association with and advocacy for protected groups, and in retaliation for opposition to discriminatory animus or anticipated opposition to such moving forward.

17. Ms. Young received a Notice of Right to Sue enabling her to bring her Title VII claims in federal court on June 4, 2025.

18. Ms. Young has filed this lawsuit within 90 days of receipt of her Notice of Right to Sue.

19. None of Ms. Young's other claims require administrative exhaustion.

## FACTUAL ALLEGATIONS

### *Defendant Mark K. Keough's Pattern of Bias, Misconduct and Abuse of Authority*

20. Despite his title being County Judge, Defendant Keough does not have a law degree, is not a licensed attorney, has never attended law school, and does not serve a judicial function. Instead, he is chief executive of the county and presiding officer of Defendant Commissioners Court.

21. Before entering politics, Defendant Keough earned a Master of Divinity from Grace Seminary and a Master of Sacred Theology from Dallas Theological Seminary. He worked for local automotive dealerships, hosted a religious radio program, founded a private religious school, founded Mark Keough Ministries, and served as Senior Pastor at The Woodlands Bible Church.

22. Immediately prior to becoming County Judge and presiding officer of the Defendant Montgomery County Commissioners Court, Defendant Keough represented House District 15 in the Texas House of Representatives. Upon taking office, he made clear that he intended to use his public position to eradicate the separation of church and state and enforce his personal religious, partisan, and political ideologies on his constituents.

23. Defendant Keough described his election to the Texas House of Representatives as a "divine appointment" and stated publicly, "We do believe that, as an extension of The Woodlands Bible Church, that this is almost as if it was a ministry as well. I approached it from that perspective. It sounds crazy, because you ask, 'Where is the separation of church and state?' You

tell me. Where is separation of church and state? It's not there."[2] After serving a term in the Texas House, Defendant Keough did not seek reelection and instead successfully ran for the office of County Judge of Defendant Montgomery County.

24. From 2018 through 2024, Defendant Keough simultaneously held the positions of County Judge and Senior Pastor at the Woodlands Bible Church. He continued in both roles until allegations surfaced that he was abusing his authority and sexually harassing church members.

25. In 2024, Defendant Keough was sued for sexual harassment by Susan Kenningham, his former assistant at the Woodlands Bible Church, where he served as Senior Pastor. According to Ms. Kenningham, Defendant Keough told her "You know, I am the County Judge. And at the snap of a finger, I could have 50 of the most beautiful women drop their pants and put their legs in the air."[3]

26. According to church elders, Defendant Keough confessed to "having had lust for another woman and to behaving in a sexually inappropriate manner" and an "an alcohol problem."[4]

---

[2] Brandon K Scott, *State Rep. elect Keough offers legislative plan at Woodlands church*, THE COURIER OF MONTGOMERY COUNTY (Oct. 22, 2014), https://www.yourconroenews.com/neighborhood/moco/news/article/State-Rep-elect-Keough-offers-legislative-plan-9497825.php.

[3] *The Sins of a Pastor*, DOLCEFINO MEDIA, https://www.youtube.com/watch?v=Hp0RCbVcKrA (last visited July 11, 2025) (video of S. Kenningham). According to its website, Dolcefino Media is a "team of investigative journalists, legal researchers, photographers, and editors" who "expose legal injustice, fraud, and corruption." *See* https://dolcefino.com/ (last visited June 17, 2025). The company is led by Wayne Dolcefino, who describes himself as "one of the most decorated reporters in Texas history with nearly 50 years of experience in journalism" and the winner of "30 Emmys." *Id.*

[4] *Id.* (including audio recording that is alleged to be Defendant Keogh's voice).

27. According to Ms. Kenningham, Defendant Keough warned her to "not cross him. Because if I did, because he is the County Judge, I would never get another job in Montgomery County."[5]

28. Ms. Kenningham was not the only person Defendant Keough put at risk while serving as Senior Pastor of the Woodlands Bible Church. Despite knowing that a parishioner had been convicted with indecency of his own daughter, Defendant Keough hired him to serve as a church elder and the treasurer.[6]

29. Although Defendant Keough denied the allegations, he nonetheless resigned from the Woodlands Bible Church but continued in his position as County Judge on Defendant Commissioners Court.

30. Outside the church, Defendant Keough exploited his government position to promote his preferred speakers and viewpoints. For example, after a brewery in the county cancelled an event headlined by Kyle Rittenhouse, a man who killed two people during a Black Lives Matter protest, Defendant Keough "weathered a storm" to ensure that the event could be held on Montgomery County public property.[7] Criticizing the brewery owner, Defendant Keough said that "giving into woke organizations, especially in the current cancel culture environment is foolish."[8]

---

[5] The *Sins of a Pastor* video also references an incident in which Defendant Keough rear-ended a former sheriff's deputy while under the influence, causing substantial injuries to the former deputy.
[6] *Id*.
[7] Ben Rowen, *Kyle Rittenhouse and What the Right is Talking About When It Talks About Censorship*, TEXAS MONTHLY (January 30, 2023), https://www.texasmonthly.com/news-politics/kyle-rittenhouse-texas-rally-censorship/.
[8] Robert Downen, *Montgomery County-owned venue will host Kyle Rittenhouse rally against censorship*, TEXAS TRIBUNE (Jan. 20, 2023), https://www.texastribune.org/2023/01/19/kyle-rittenhouse-rally-conroe/.

31. Unfortunately for Ms. Young, Defendant Keough's protection of free speech extended only to the speech with which he agreed.

***Ms. Young's Dedication to Montgomery County, Texas***

32. Rhea Young grew up in Montgomery County, Texas.

33. She attended first through twelfth grades in the Splendora Independent School District ("SISD" of "the District"), where she was involved in Student Council and Future Teachers of America, among other extracurricular activities and student organizations.

34. After graduating within the top ten of her class in 1984, Ms. Young pursued her passion for education, intending to return to SISD as a teacher.

35. Ms. Young earned her Bachelor of Arts in Teaching from Sam Houston State University in 1990.

36. She then returned to Montgomery County, Texas to build her career and raise her own family.

37. Ms. Young taught Geography and English at Splendora High School for the first nine years of her career.

38. While teaching, Ms. Young continued her own education and earned a Master of Library Science from Sam Houston State University in 1999.

39. She then used her advanced degree to serve SISD for another twenty-three years, as a librarian.

40. In 2008, after excelling as an elementary librarian for nearly a decade, SISD promoted Ms. Young to the District's most senior librarian position, District Librarian, a position she held until she retired in 2022.

41. While working for SISD, Ms. Young served as Splendora High School's Student Council Advisor for several years.

42. In recognition of her dedication to the Student Council, Ms. Young was nominated by her students for the Texas Association of Student Councils' Advisor of the Year award for District 7 - and she won.

43. Under Ms. Young's direction, Splendora High School's Student Council won the Texas Association of Student Councils' annual Top Project award three times.

44. During her thirty-two years working for SISD, from her college graduation through her retirement, Ms. Young never received a negative performance evaluation or disciplinary action of any kind.

45. In fact, SISD highlighted Ms. Young as a "Cool Cat Story" in September 2024.[9]

46. While dedicating decades to her career and community, Ms. Young became a beloved wife, mother, and grandmother.

47. Ms. Young has raised three children, including one transgender child, and is a loving grandmother to her eight grandchildren.

48. As the mother of a transgender child, Ms. Young is deeply committed to ensuring equal treatment for all Montgomery County residents, irrespective of their gender identity, sexual orientation, or religious affiliation.

***Defendants Adopt a Nationwide Playbook for Censoring Books and Punishing Employees Who Speak Out Against Censorship***

49. In 2021, a fresh wave of censorship swept across the nation.

[9] *Cool Cat Stories Rhea Cunningham Young*, SPLENDORA INDEPENDENT SCHOOL DISTRICT (Sept. 1, 2024), https://www.splendoraisd.org/cool-cat-stories/cool-cats-stories-details/~board/cool-cats/post/rhea-cunningham-young.

50. According to the American Library Association, in 2020, 278 books were challenged nationwide.[10]

51. During the 2021-22 school year, that number skyrocketed: 3,916 books were challenged,[11] and over 1,600 book titles were censored in the United States according to PEN America.[12]

52. In 2022, the number of attempts to censor books rose to 1,269 demands, targeting 2,571 unique titles – a 38% increase from the year before and a record since the American Library Association ("ALA") started collecting censorship data over twenty years ago.[13]

53. By the end of 2023, the numbers deteriorated further, culminating in challenges to 4,240 unique book titles in schools and libraries across the country—a 65% increase from the year before.[14]

54. The American Library Association estimates that in 2024, 5,813 individual books were challenged, which would be yet another 37% increase on the number of books PEN estimates were challenged in 2023.[15]

---

[10] *American Library Association kicks off National Library Week with the Top 10 Most Challenged Books of 2024 and the State of America's Libraries Report*, AMERICAN LIBRARY ASSOCIATION (April 7, 2025), https://www.ala.org/news/2025/04/american-library-association-kicks-national-library-week-top-10-most-challenged-books.

[11] *Id.*

[12] *Banned in the USA: The Mounting Pressure to Censor*, PEN AMERICA, https://pen.org/report/book-bans-pressure-to-censor/ (last visited July 11, 2025).

[13] AMERICAN LIBRARY ASSOCIATION, https://www.ala.org/news/press-releases/2023/03/record-book-bans-2022 (last visited July 11, 2025).

[14] ALA, https://www.ala.org/news/2024/03/american-library-association-reports-record-number-unique-book-titles (last visited July 11, 2025).

[15] *American Library Association kicks off National Library Week with the Top 10 Most Challenged Books of 2024 and the State of America's Libraries Report*, AMERICAN LIBRARY ASSOCIATION (April 7, 2025), https://www.ala.org/news/2025/04/american-library-association-kicks-national-library-week-top-10-most-challenged-books.

55. In 2024, groups and government entities initiated 72% of demands to censor books in either public libraries or school libraries; only 16% came from parents.[16]

56. This alarming trend is particularly focused on young adult books dealing with race, gender, and sexual identity.[17] Nearly 50% of the books that were targeted involved LGBTQ+ content or the voices or experiences of individuals of color.[18]

57. Pro-censorship individuals or groups seeking to impose subjective political, religious, or moral agendas on their communities are driving the surge, demanding censorship of dozens and even hundreds of titles at once.[19]




Daniel Arkin, *More than half of 2023's most challenged books have LGBTQ themes* NBC NEWS (April 9, 2024) [20]

[16] *Banned Book Data*, ALA, https://www.ala.org/bbooks/book-ban-data (last visited July 11, 2025).
[17] *Id.*
[18] *ALA Reports Record Number of Unique Book Titles Challenged in 2023*, ALA, https://www.ala.org/news/2024/03/american-library-association-reports-record-number-unique-book-titles (last visited July 11, 2025).
[19] *Id.*
[20] https://www.nbcnews.com/nbc-out/out-news/banned-books-lgbtq-library-association-rcna146236.

58. One of the national organizations leading the push to censor books is the American Family Association, through its governmental affairs affiliate AFA Action.[21]

59. On its website, AFA Action prescribes what it calls "Model Legislation" for "Requiring Age-appropriate Guidelines for Libraries,"[22] the goal of which is to censor LGBTQ+ content.

60. That legislation was drafted by Jameson Taylor, who consults for AFA Action.

61. Mr. Taylor has openly discussed his hatred of LGBTQ+ people, even going as far as to defend laws that would sentence all LGBTQ+ people to death.

62. When addressing a Ugandan law that authorizes the execution of LGBTQ+ people, "[Mr.] Taylor defended the Uganda law as 'divine law and natural law' not unlike penalties the early American colonists lodged against gays. Speaking before the gathering of right-wing Christian nationalists, [Mr.] Taylor said that 'following British law, the American colonies imposed the death penalty for sodomy.' [Mr.] Taylor said that Thomas Jefferson and others sought to change the law 'calling instead for castration and that was because he wanted to reserve the death penalty only for murder and treason.' [Mr.] Taylor said the 'very lenient Quakers in Pennsylvania preferred to punish sodomy with whipping, forfeiture of one-third of one's property, and six months hard labor for a first offense.'"[23]

63. Mr. Taylor's library policies are explicitly designed to censor LGBTQ+ authors and voices, while evading judicial review. In one post, he celebrated Mississippi's successful

---

[21] AFA ACTION, https://afaaction.net/ (last visited June 26, 2025).
[22] *Model Legislation*, AFA ACTION, https://afaaction.net/media/syfimp1p/library-collection-guidelines-for-young-students-model-2023.pdf (last visited June 26, 2025).
[23] Phil Garber, *Christian Nationalists Cheer Uganda Law To Execute Homosexuals* (June 25, 2023), https://philgarber.medium.com/christian-nationalists-cheer-uganda-law-to-execute-homosexuals-175d74c498f8.

attempts to limit access to LGBTQ+ books, which skirted the usual "questions – and political headaches" that usually prevent his efforts at censorship.[24]

64. The Defendants and their staff have adopted the views of the AFA and Mr. Taylor, relying on AFA materials to guide their governmental decisions.

65. For example, County officials used their government emails to subscribe to newsletters from the AFA, which urged the government officials to avoid the "drift[] into the arms of a secular deep-state tyranny."

**From:** AFA Action <action@afaaction.net>
**Sent:** Thursday, January 25, 2024 9:05 AM
**To:** Sutton, Kimberly
**Subject:** [External] Join us in fighting evil in 2024.

[redacted]

afa ACTION

Dear Kimberly,

As we enter 2024, I want to take a moment to frame the crisis American families are facing in bold, simple terms.

Once we get past all the hyper-politicized framing of the battles we face—pro-life vs. pro-choice, LGBTQ rights vs. religious freedom, gender identity vs. biological reality—**what is really at the core of our cultural divide?**

The vast majority of these issues are not a battle of Right vs. Left, MAGA vs. woke, or traditional vs. progressive.

**They're a battle of good vs. evil.**

God's prophetic Word directly addresses this battle in Isaiah:

> *"Woe to them who call evil good, and good evil. That put darkness for light, and light for darkness."*

Kimberly, we're certainly witnessing evil being called good and good being called evil in America today, aren't we?

- **Murdering innocent babies** reframed as ***"reproductive rights"***
- **Mutilating children** reframed as ***"gender-affirming care"***
- **Pedophiles** reframed as ***"minor-attracted persons" (MAPs)***
- **Sexually explicit school material** reframed as ***"social-emotional learning" (SEL)***

1

66. These newsletters, which Defendant Keough's staff subscribed to using their government emails, described "pro-life vs. pro-choice, LGBTQ rights v. religious freedom, gender

[24] *Flipping the Script on Porn Peddlers*, MAGNOLIA TRIBUNE (Mar. 12, 2023), https://magnoliatribune.com/2023/03/12/flipping-the-script-on-porn-peddlers/.

identity vs. biological reality," "Right vs. Left, MAGA vs. woke," as really being about "a battle of good vs. evil."

67. Groups like AFA coordinate campaigns to target LGBTQ+ content and communities.[25]

***In 2022, the Montgomery Library System Hires Ms. Young***

68. In September 2022, the Montgomery County Memorial Library System reached out to Ms. Young, then serving as District Librarian for the local school district and offered her the position of Director of the Library System.

69. At the time, Defendant Commissioners Court was comprised of the following five members: Defendants Keough and Walker, and Commissioners Noack, Metts, and Riley.

70. During her interview, members of Defendant Commissioners Court asked Ms. Young pointed questions aimed at determining whether she would be willing to discipline or terminate employees for expressing pro-LGBTQ+ views that conflicted with the County's narrow partisan and political ideology.

71. Specifically, members of Defendant Commissioners Court asked Ms. Young how she would have handled a prior situation involving a former library employee who had shared pro-LGBTQ+ posts on the library's Facebook page—content which the Commissioners found distasteful and objectionable based their personal ideological beliefs.

72. Ms. Young supported the rights and dignity of LGBTQ+ individuals. When asked whether she would be willing to punish an employee for expressing LGBTQ+ views, Ms. Young

[25] Andrew Limbong, *New Report Finds a Coordinated Rise in Attempted Book Bans*, NPR (Sept. 19, 2022), https://www.npr.org/2022/09/19/1123156201/new-report-finds-a-coordinated-rise-in-attempted-book-bans.

responded that she would simply follow applicable County and Library System policies in addressing such matters but declined to commit to doing so.

73. From the context of the questioning, Ms. Young also understood that the Commissioners did not want her to hire or retain staff who expressed understanding of LGBTQ+ individuals publicly, including on their own time.

74. Ms. Young's suspicions were later borne out after several Commissioners, including Defendant Keough, Commissioner Noack, and Defendant Wheeler suggested she terminate another Library System employee who regularly posted on her personal social media pages messages that were critical of censorship and book bans, and in which she supported LGBTQ rights and individuals. Ms. Young declined to do so.

75. MCMLS hired Ms. Young as the Director of the Library System on September 6, 2022.

***Book Ban Attempts and Ideological Control Comes to Montgomery County***

76. Around the same time that MCMLS hired Ms. Young as the Director of the Library System, local pro-censorship and anti-LGBTQ activists began pushing the same censorship policies as similarly aligned national organizations.

77. Specifically, and following the lead and guidance of the national anti-LGBTQ+ push, local pro-censorship community activists in Montgomery County joined in the effort, pressuring members of Defendant Commissioners Court to adopt more conservative stances, implement stricter censorship of LGBTQ+ voices, and impose their views on what is orthodox on the people of Montgomery County.

78. In May 2022, Jessica Martin-Brassington launched the "Mama Bears Rising" movement with the stated goal of running for school board in Conroe, Texas. Her campaign was primarily motivated by a desire to censor LGBTQ+ authors and content in schools and libraries.

79. Around that same time, Ms. Brassington joined forces with another outspoken anti-LGBTQ+ activist: Michele Nuckolls.

80. Ms. Nuckolls runs a blog called "Two Moms and Some Books," which is dedicated to identifying and censoring LGBTQ+ authors and voices in public libraries.[26]

81. In the summer of 2022, Ms. Nuckolls, Ms. Brassington, and other community members met with an unidentified Defendant Montgomery County Commissioner to express concerns about what they described as "gender confusion" in library materials.

82. In response, the Commissioner assured them that Defendant Montgomery County was already taking steps to address their concerns. He explained that the current Library Director was retiring and that efforts were underway to "quietly" hire a "conservative" replacement and revise library policies in alignment with the group's views.

83. On November 18, 2022, less than two months after Ms. Young started working as the Library Director of MCMLS, Ms. Brassington emailed Defendant Keough's Government Relations Manager, Jean Mann ("G.R. Manager Mann"), to follow up on the group's earlier meeting with the commissioner. She wrote: "Following up from our meeting regarding policy in the library and status of library director. Any new developments?"

[26] While Ms. Nuckolls' "Two Moms and Some Books" blog is still accessible, Ms. Nuckolls recently started a new blog entitled "Liberty Library Project." *See* LIBERTY LIBRARY, https://libertylibrary.org/?fbclid=IwY2xjawLeBCRleHRuA2FlbQIxMABicmlkETE5VndZMEtuWW9CdnlHR2hjAR4gBjs93ItfSoJ5NX_xBOBfuyRRBq6Svta1RfnGgKtjBCy9d1SgxyhVfpyUsw_aem_5uS0PrUoGgGLa9y_3bE6FA (last visited July 11, 2025). The Liberty Library Project blog highlights at least one instance of coordination between Ms. Nuckolls and members of Defendant Commissioners Court, detailed below, in which Ms. Nuckolls coordinated with those members to purchase and place conservative books on the Library System's shelves, specifically because those members agreed with the books' viewpoints.

84. G.R. Manager Mann responded that same day, assuring Ms. Brassington that Defendant Keough "is adamant to handle this situation" but that "timing is everything" and "we are letting our new director get her feet wet."

***After Ms. Young's Hiring, Defendants and Anti-LGBTQ+ Activists Engage in a Campaign to Censor Library Content and Stigmatize Gay and Transgender Community Members***

85. The "new director" referenced in G.R. Manager Mann's email was Ms. Young.

86. However, rather than allow Ms. Young to get her "feet wet," as Ms. Mann had suggested, Ms. Nuckolls and members of Defendant Commissioners Court began working together behind the scenes to undermine her authority and advance their censorship agenda.

87. For example, on March 24, 2023, Ms. Nuckolls emailed Defendant Keough requesting that the Library segregate all books "that speak plainly about gender and pronouns."

88. In the same email, Ms. Nuckolls also demanded that Defendant Keough direct the Library System to purchase several books published by "Brave Books," a publisher that specializes in making "books for kids that reinforce biblically based, foundational values," and place those books on the shelves in the children's section as replacements for the challenged LGBTQ+ titles.

89. On March 27, 2024, a member of Defendant Keough's administrative staff emailed Ms. Nuckolls to confirm that all her Brave Books had been ordered and added to the Library System's collection. Ms. Nuckolls acknowledged that Defendants Walker and Gray purchased certain of these books themselves.

90. Just one day later, on March 28, 2023, Ms. Nuckolls addressed the Commissioners during Commissioners Court, claiming to have found more than twenty books in the MCMLS collection that "encourage children to consider different gender identity not as pretend play."[27]

[27] For context, around that time, the MCMLS collection included more than 210,000 children's books, about 56,000 young adult books, and nearly 400,000 adult books.

91. She proceeded on to argue that these books should be moved to the adult section "away from young hands" and asserted that MCMLS had no books "containing the other point of view" except one copy of *Irreversible Damage* by Abigail Shrier.

92. Ms. Nuckolls concluded her public comment by listing books she wanted MCMLS to add to its collection, including Brave Books' *Elephants are Not Birds*.

93. In response to Ms. Nuckolls's complaints about LGBTQ books, Defendant Keough used this meeting to nominate a new member to the committee that reviewed book challenges: Ryan Hutson.

94. Before adjourning the meeting, Defendant Keough asked Ms. Nuckolls to stay afterward, stating, "I would like to talk about this."

95. The very next day, on March 29, 2023, Ms. Nuckolls sent policy suggestions to Defendant Keough's staff, asking them to move books that discussed gender identity and pronouns "upstairs AWAY from young books." She also submitted a list of books that reflected her own transphobic views for inclusion in the collection.

96. Defendant Keough also had a phone conversation with Ms. Nuckolls and then asked his administrative assistant to forward Ms. Nuckolls' book list to his Deputy Chief of Staff. In forwarding the message, the assistant wrote, "The judge asked me to send this to you so you could forward to Ryan [Hutson, discussed below, who was a citizen on the committee that reviewed book challenges at the time]. He wanted you both to take a look at the book list, he said."

97. Ms. Nuckolls later stated that her advocacy was motivated by what she saw as a lack of "Christian" children's books in the Library System's collection.

98. In reality, the Library System already included numerous books that reflected "Christian" perspectives.[28]

99. It became clear that Ms. Nuckolls' concerns were not genuinely about ensuring balanced representation of "Christian" perspectives, but rather about imposing her personal, biased, and ideological agenda on the Library System and thus wider community.

100. For example, Ms. Nuckolls objected to the inclusion of a book about the U.S. "Border Patrol," not because of any allegedly sexually inappropriate content, but because it expressed perceptions about immigration enforcement that she personally disagreed with, exposing her true goal of eliminating heterodox thought in the community and enforcing strict orthodoxy to her own personal ideologies across the wider community.

101. These actions, along with her repeated demands to remove LGBTQ+ authors and content and replace it with ideologically compatible materials, elucidate how Ms. Nuckolls, along with the Commissioners who collaborated and conspired with her and other pro-censorship activists, exploited the rhetoric of parental concern as a cover for their true objective, which was to more broadly impose their limited political, religious, and partisan ideologies upon the broader

---

[28] As discussed below, the Library System's technical services manager analyzed the MCMLS catalogue based on publishers and subject terms on or around January 11, 2025. The MCMLS catalogue included 22,621 copies of 10,555 distinct titles with the following subjects: Bible, Biblical, Christian, Christianity, Conservatism, Conservative, Devotional, Ethics & Moral Philosophy, God, Jesus, Religious, and Religion. Titles came from the following publishers: Abingdon Press, B&H Publishing, Baker Books, Barbour Publishing, Baylor University Press, Bethany House, Bloomsbury Continuum, Brave Books, Concordia Publishing, Crossway, Eerdmans, FaithWords, Focus on the Family, Fortress Press, Harvest House, Ignatius Press, Intervarsity Press, John Knox, Kregel Publications, Libertas Press, Moody Publishers, Multnomah, Paraclete Press, Paulist Press, Revell, a division of Baker Publishing Group, Thomas Nelson, Tyndale, University of Notre Dame Press, WaterBrook, Westminster John Knox Press, Worthy Publishing, and Zondervan. For comparison, the same analysis revealed that the MCMLS catalogue contained only 5,296 copies of 2,007 distinct title with the following subjects: sexual, Bisexual, Coming out, Gay, Gender dysphoria, Gender identity, Gender-nonconforming, Lesbian, LGBT, Queer, Sexual minorities, Sexual orientation, and Transgender.

community, including a hate of LGBTQ+ individuals, and a desire to create a hostile library environment in the Library System towards LGBTQ+ people.

102. Despite Ms. Nuckolls' undemocratic motivations, Ms. Young did not object to adding books requested by Ms. Nuckolls to the Library System's collection. In fact, Ms. Young worked with Ms. Nuckolls to add several suggested titles and series, as detailed below.

103. However, given the size of the MCMLS collection, the Library System relied on professional selection aids. Books were purchased only if they had been positively reviewed by reputable literary journals such as Kirkus Reviews, School Library Journal, Booklist, Library Journal, and Publisher's Weekly.

104. And while Brave Books can submit their books for review to journals, Brave Books had chosen not to do so.

105. When Ms. Nuckolls requested that the Library System purchase Brave Books or other conservative-leaning picture books, Ms. Young did not question or express any concern about the viewpoint of the books.

106. Instead, Ms. Young explained that the Brave Books titles had not been reviewed by a reputable journal and were made of comparably nondurable binding, and they therefore did not qualify for purchase under the Library System's pre-existing, long-established selection policies.

107. Ms. Nuckolls herself acknowledged that Brave Books likely would not qualify under the Library System's selection process because they had not been reviewed by a reputable journal. However, she still insisted that they be purchased and included in the Library System's collection even though they were unreviewed, and the Library System already included a wide range of books on Christianity and conservatism.

108. Ms. Young informed Ms. Nuckolls that because the books did not meet the Library System's standards, they could not be purchased using Library System funds. However, she invited Ms. Nuckolls to suggest alternative titles that would comply with the Library System's selection policies.

109. In keeping with that process, the Library System purchased several titles at Ms. Nuckolls' request, including but not limited to: *The Berenstain Bears Values and Virtues Treasury*; *The Dragon and the Stone*; *The Prince and the Blight*; *Building a Family of Faith: Simple and Fun Devotions to Draw You Close to Each Other and Nearer to God*; *My First Veggie Bible Story*; *Joy to the World*; *Baby Jesus is Born*; *Little Bird Finds Christmas*; *Joshua Crosses the Jordan*; *Jesus Feed the Five Thousand*; *the Purpose of Driven Life*: *Devotional for Kids*; *Give Thanks to the Lord*; and *the Beginner's Bible Read Through the Bible*.

110. Other titles requested by Ms. Nuckolls did not meet the Library System's standards for purchase because they were not sold by approved vendors, did not meet the criteria of "suitability of format for library use," or lacked durability and might quickly deteriorate, making their purchase an inefficient use of public funds.

111. In those cases, Ms. Young advised Ms. Nuckolls on alternative ways to add the books to the Library System's shelves, including through donations or by finding approved vendors for the books.

112. At first, Ms. Nuckolls expressed feeling "overwhelmed with gratitude" for Ms. Young's guidance.

113. She sent an email on April 4, 2023, copying Defendant Keough, in which she thanked Ms. Young for "explaining the policies and requirements."

[External] Thank you!

From Michele Nuckolls <[redacted]
Date Tue 4/4/2023 7:56 AM
To Young, Rhea <rhea.young@countylibrary.org>
Cc Keough, Mark <mark.keough@mctx.org>

Ms. Young,

I was able to review the list you sent me Wednesday, and I am overwhelmed with gratitude. This list is incredible, and I can't wait to check out each book and share them with my family. Thank you so very much!

I have been in touch with Brave Books about getting their books reviewed, and my understanding is that the journals charge about $400 per book submission without any guarantee of an actual review. I am not sure if they decided it was cost prohibitive, or if they might attempt to move forward with a few. I suggested they attempt a review with Kirkus Reviews first, and I haven't followed up yet.

However, I am going to see what I can do to get the books donated. I appreciate very much your willingness to place them if they are donated. This is what I am going to begin working on right away. I appreciate your help in explaining the policies and requirements.

Thank you again!

Michele Nuckolls
[redacted]

"Not by might, nor by power, but by my Spirit, says the Lord of Hosts." Zech 4:6

114. Following Ms. Young's suggestion, Ms. Nuckolls set out to secure her preferred books through alternative sources.

115. One of these sources was Defendant Gray, whose staff reached out to Ms. Nuckolls because Defendant Gray wanted to donate the *Tuttle Twins* series to the Library System. The series was not available through the Library System's approved vendors, so it could not be acquired through standard purchasing procedures.

116. Another one of these sources was Defendant Keough, who donated *Elephants are Not Birds* to the Library System and appeared in a *Texas Scorecard* article, holding a copy of the book he had donated.[29]

[29] *See* Erin Anderson, *County's New Library Policy Protects Kids From Adult Content*, TEXAS SCORECARD (July 18, 2023), https://texasscorecard.com/local/countys-new-library-policy-protects-kids-from-adult-content/. Defendant Keough later mentioned this same book in a

117. The fifth book in Brave Books Saga One, *Elephants Are Not Birds* by Ashley St. Clair and Kara Rogers "tackles the topic of identity" and is intended for children ages four to twelve, according to the publisher.[30]

118. Defendants' decision to purchase and promote that title for the children's section of MCMLS demonstrates that Defendants did not oppose all books addressing gender identity. Rather, their actions illustrate that they seek only to censor LGBTQ+ content from the children's section, while allowing and even promoting books that reflect the gender norms or ideologies that are aligned with their own personal beliefs.

119. In total, Montgomery County District Attorney Brett Ligon, County Attorney B.D. Griffin, and Defendant Keough purchased 140 Brave Books titles for MCMLS.[31]

120. Although Ms. Young failed to share the viewpoints expressed in the Brave Books, she did not attempt to leverage her government position to exclude or otherwise censor the books.

121. Instead, Ms. Young objectively and neutrally applied Library System policy to these donations, shelving all of them, and placing them in the collection where the policy dictated.

122. While MCMLS policy prevented Ms. Young from spending county funds on these books, it permitted her to receive the book as donations.

---

conversation with Ms. Young the day before Defendant Commissioners Court approved Defendant Keough's proposed Reconsideration Policy.

[30] *Elephants Are Not Birds*, BRAVE BOOKS, https://bravebooks.us/products/elephants-are-not-birds (last visited June 23, 2025); *see also* Jon Levine, *Conservative children's publisher* Brave Books *debuts with 'Elephants Are Not Birds,'* NEW YORK POST (July 24, 2021), https://nypost.com/2021/07/24/conservative-publisher-brave-books-debuts-with-elephants-are-not-birds/ ("The book is an unapologetic rebuke of transgender acceptance and the growing number of young people identifying as trans, says author Ashley St. Clair.").

[31] Ceili Doyle, *To ban or expand? Resident of The Woodlands fights for Christian children's books in library*, HOUSTON LANDING (June 13, 2023), https://houstonlanding.org/montgomery-county-books-ban-christian-lgbtq-library.

123. Consistent with Library System policy, Ms. Young stocked the donated books without regard to their content or viewpoint.

124. Ultimately, though, the addition of these books was not enough for Ms. Nuckolls, who turned to more extreme measures to begin to implement her extreme agenda.

***Defendants Make Explicit Their Plan to Burn LGBTQ+ Books and Persecute LGBTQ People***

125. On May 15, 2023, the committee that reviewed book challenges met to discuss two books.

126. Mr. Hutson—who was appointed to the committee by Defendant Keough—demonstrated such vitriolic and persecutive behavior towards LGBTQ+ people during this meeting that four different committee members later agreed to provide Ms. Young letters, describing their concerns about his behavior.

127. At the meeting, Mr. Hutson suggested that the Library District begin burning books.

128. Mr. Hutson opened the meeting by arguing that people who did not have children should not have a seat on the committee and should not offer an opinion on which books should be retained or not, then suggested that non-retained books should be burned. This abrasive attitude continued as the committee turned to discussing the two books under review.

129. One book under review was *It's Perfectly Normal*, by Robie H. Harris, which was written in 1994, and has been heralded for decades for its approachable and accurate discussion on puberty, changes in bodies, sexual orientation, and gender.

130. During a discussion of this book, Mr. Hutson, called the book "degenerate, garbage, and should not only be taken out of the library but should also be burned."[32]

---

[32] These quotes are taken from the letters that committee members wrote to Ms. Young.

131. A committee member and several librarians immediately reported these comments to Ms. Young after the meeting.

132. One committee member wrote that "More than once he [Mr. Hutson] talked about burning books and said they were trash. . . . Library staff did not get the chance to interject that we do not burn books."

133. During the meeting, Mr. Hutson claimed *It's Perfectly Normal* had "a picture of sodomites in it."

134. In response to Mr. Hutson's diatribe, a committee member explained that "the book would be a good teaching tool for someone who needed to explain things to their child. [For example, for] a single mother with a son, whose father had passed away," the book could "be a way to open a discussion with a boy about things men usually teach boys."

135. Mr. Hutson dismissed this concern about single mothers, saying "another family member should do that."

136. According to another letter obtained by Ms. Young, a committee member observed that, "At one point he [Mr. Hutson] stated that the entire LGBTQ group of people needed to be done away with."

137. Mr. Hutson's ire was also directed at the other book under review, *The Antiracist Kid*, by Tiffany Jewell.

138. One committee member opined that the book "did not seem as if it was something that a child would check out by themselves, as it is rather long, but rather, would be checked out by a parent as a teaching tool."

139. But Mr. Hutson responded "that it should be out of the library," and "it was teaching kids that white people were colonizers."

140. According to another committee member, throughout the meeting, Mr. Hutson was "hostile toward the real diverse characters in these two nonfiction books."

141. Mr. Huston claimed that he even took the books to the sheriff and asked the sheriff to charge someone at the Library System with a crime for shelving the books.

142. The committee member felt that any "effort to provide a different perspective [was] overshadowed by the effort to try and calm him down and not be bullied by someone with an overzealous, angry and uncompromising attitude. It was difficult to get a consensus from the remaining citizens about the books, or hear their opinions due to his disruptive behavior."

143. Another committee member framed her decision to speak up against Mr. Hutson's attempts to burn LGBTQ+ and antiracist books, and even eradicate LGBTQ+ people, as being driven by lessons from history:

> So why am I writing to you a month after the committee meeting? I've just returned from a trip to Berlin after meeting with my daughter there for her work conference. She arranged for us to take a walking tour of this historic city. One of our last stops was at the Humboldt University campus where Einstein attended. Before the Third Reich intervened, the university library was considered the best in Europe.
>
> In May 1933 however, the Nazis burned over 20,000 books in the plaza out front of the library . . . A plaque nearby had a quote from Heinrich Heine: 'This was but a prelude; where they burn books, they ultimately burn people.

144. In these and later committee meetings, Mr. Hutson made his intentions clear. His present focus was to get the Library System to destroy and burn LGBTQ+ and race-conscious books. But his ultimate goal was to effectuate the alienation and erasure of LGBTQ+ people from public institutions and wider society.

145. Ms. Young first approached Commissioner Noack with the letters from committee members describing Mr. Hutson's conduct at the meetings. Commissioner Noack disagreed with

Mr. Hutson's conduct and instructed Ms. Young to follow up with Defendant Keough, who was the only Commissioner with authority to remove Mr. Hutson. Ms. Young then took the letters to Defendant Keough, who did nothing.

146. From that point, Mr. Hutson began criticizing Ms. Young in private emails and public comments, retaliating against her for raising concerns about the positions he advocated, including book burning.

***Defendants and Pro-Censorship Activists Conspire to Repackage Censorship as Book Relocation***

147. Over time, the efforts by Defendants and Ms. Nuckolls to target and suppress LGBTQ+ authors and content became increasingly explicit.

148. In her communications with G.R. Manager Mann, Ms. Nuckolls openly expressed her desire to restrict access to LGBTQ+ content and stigmatize LGBTQ+ people by moving certain books to the adult section and prohibiting minors from accessing them.

149. The aim of segregating the books was explicitly to send the message to the community that LGBTQ+ people were bad, evil, harmful, and not natural to their fellow citizens, and to make the library branches hostile for LGBTQ+ individuals.

150. G.R. Manager Mann stated that she understood Ms. Nuckolls' objections to LGBTQ+ content but expressed concern about the unintended consequences of removing those books. Instead of outright removing the books, G.R. Manager Mann suggested that the Library System impose a review board, which could surreptitiously censor books, without drawing the same attention as an outright ban.

151. G.R. Manager Mann wrote, "we understand your stance, but pulling these books from the library could backfire with people demanding we remove The Bible and conservative

books. To help combat this we have put in place a committee to read all new material before we accept them."

152. By July 2023, there was mounting pressure on Defendant Commissioners Court to impose even stricter limits on access to books that conflicted with the pro-censorship activists' anti-LGBTQ+ views.

153. Such efforts were expressly motivated by bias and prejudice, and with the effort of making the public institution hostile to LGBTQ+ constituents.

154. On or around July 6, 2023, Ms. Nuckolls emailed G.R. Manager Mann, reminding her that G.R. Manager Mann had previously assured her there would be a "conservative committee" in place to prevent placement in the library of new LGBTQ+ books like *Pink, Blue and You! Questions for Kids About Gender Stereotypes* by Elise Gravel and Mykaell Blais. She expressed frustration that the effort had fallen short, writing that "the valve has unfortunately, not been shut off."

**From:** Michele Nuckolls [redacted]
**Sent:** Thursday, July 6, 2023 1:48 PM
**To:** Mann, Jean <jean.mann@mctx.org>
**Subject:** [External] Pink, Blue and You, being catalogued

Hi Jean,

I think you had mentioned that there was supposed to be a conservative committee that would prevent new books like this from coming into the library.

I thought I would let you know that a new copy of Pink, Blue and You, which teaches kids about choosing their own gender and they them pronouns, is being catalogued in Conroe. We have reason to believe there is another copy soon to show up at the South Branch.

This is concerning and shows that the valve has unfortunately, not been shut off.

Here is the link that shows the catalogue. https://hcpl2.ent.sirsi.net/client/en_US/mcmlweb/search/detailnonmodal/ent:$002f$002fSD_ILS$002f0$002fSD_ILS:1487802/ada?qu=Pink+blue+and+you&d=ent%3A%2F%2FSD_ILS%2F0%2FSD_ILS%3A1487802%7EILS%7E0&h=8

Thanks,

155. In response, G.R. Manager Mann wrote: "Just a quiet heads up, I'm going to attend the next [book review committee] meeting to see how [the meetings] operate." (emphasis in original). Ms. Nuckolls replied that she'd keep Ms. Mann's involvement "on the down low" confirming their covert coordination to influence library acquisitions was based on ideological bias rather than established policy or professional standard.

**Mann, Jean**

**From:** Mann, Jean
**Sent:** Friday, July 7, 2023 8:24 AM
**To:** Michele Nuckolls
**Subject:** RE: [External] Pink, Blue and You, being catalogued

Thanks, lady!

**Kind regards,**

**Jean Mann**
**Government Relations**

**Office of Montgomery County Judge Mark J. Keough**
501 N. Thompson, Suite 401
Conroe TX 77301
Direct (936) 538-5536
Office (936) 539-7812

**From:** Michele Nuckolls [redacted]
**Sent:** Thursday, July 6, 2023 5:16 PM
**To:** Mann, Jean <jean.mann@mctx.org>
**Subject:** Re: [External] Pink, Blue and You, being catalogued

I think that's an excellent idea. I will keep this on the down low.

Michele Nuckolls
[redacted]
'Not by might nor by power, but by my Spirit,' says the LORD Almighty. Zechariah 4:6

On Thursday, July 6, 2023, 4:01 PM, Mann, Jean <jean.mann@mctx.org> wrote:

Just a **quiet** heads up, I'm going to attend the next meeting to see how they operate.

Thank you for all your input.

**Kind regards,**

156. G.R. Manager Mann showed up to the next meeting of the committee that reviewed book challenges, along with Jason Smith—Defendant Keough's Deputy Chief of Staff. Ms. Young attempted to stop them from entering the meeting, as the Defendant Commissioners Court's own rules state that only committee members can attend these meetings.

157. To that end, she called Defendant Keough and asked him to advise his staff to leave the meeting. But Defendant Keough insisted that his staff enter the meeting, against rules, and "observe." With these orders, Ms. Young let G.R. Manager Mann into the room.

158. Although she promised to only observe the meetings, G.R. Manager Mann actively participated, urging the committee to ban or restrict access to books that did not align with the anti-LGBTQ+ ideology that she shared with Defendants.

***Defendants Design and Impose a Book Segregation Policy that Excludes Ms. Young in an Attempt to Impose an Officially Prescribed Orthodoxy***

159. In advance of the July 11, 2023, meeting, Ms. Nuckolls and G.R. Manager Mann proposed a new book segregation policy, which (as discussed in more detail below), would (1) remove the quality controls that governed what books the Library System could spend public funds on, (2) segregate LGBTQ+ books away from the children's section, and (3) forbid children from accessing LGBTQ+ books.

160. At the July 11, 2023, meeting of Defendant Commissioners Court, members of Defendant Commissioners Court considered whether to follow Ms. Nuckolls's and G.R. Manager Mann's plans and impose a new segregation policy that was a pretext for censoring books that conflicted with their own narrow political, personal, and religious views.

161. In advance of this meeting, Ms. Nuckolls had devised a plan to censor LGBTQ+ books while skirting the Supreme Court's prohibitions on censorship. In her blog posts, Ms. Nuckolls opines that any book with LGBTQ+ characters and content is "inherent[ly]"

vulgar.[33] Recognizing that current Supreme Court precedent usually forbids governments from restricting books based on their viewpoint, Ms. Nuckolls urged her followers to reframe their objections to LGBTQ+ content as concerns about "vulgarity," hoping doing so would provide government officials with a smokescreen to justify censorship of the books despite constitutional protections.[34]

162. At the meeting itself, Ms. Nuckolls played ringleader, putting to test her plan to ban the books while skirting constitutional protections. Ms. Nuckolls began by stating that she had repeatedly informed members of Defendant Commissioners Court that the Library System carried "100 copies" of what she referred to on her blog as "children's gender fluid library books." She let these members know that her "friends" would be reading passages from those books.[35]

163. Many of the books referenced by Ms. Nuckolls in fact do not contain themes of "gender fluidity."

164. For instance, Ms. Nuckolls' attacked *The Antiracist Kid* by Tiffany Jewell, complaining that the book "contains alternate gender ideologies, controversial historical, racial, and cultural commentary, and alternate sexualities."

165. That book focuses on educating children about racism, not gender theory.[36]

---

[33] *If you have a child in Conroe ISD*, Two Moms and Some Books, https://twomomsandsomebooks.substack.com/p/if-you-have-a-child-in-conroe-isd (last visited June 18, 2025).

[34] *Id.*

[35] Ms. Nuckolls' complete and updated list can be found on her blog. Michele Nuckolls, *Updated Children's Gender Fluid Library Book List*, Two Moms and Some Books (Dec. 15, 2023), https://twomomsandsomebooks.substack.com/p/updated-childrens-gender-fluid-library.

[36] Ms. Nuckolls decision to attack books that address racism, falsely claiming that these books center on "gender" issues, is part of a nationwide trend to paint all books that discuss marginalized perspectives as being inappropriate for children. Ms. Nuckolls herself similarly characterized as "gender fluid" titles such as "This Book is Antiracist" by Tiffany Jewell. Ms. Nuckolls' strategy is out of the playbook of national organizations like Moms for Liberty, which has circulated a 111-

166. Ms. Nuckolls stated that she had spoken with Ms. Young about more than 100 children's books that she claimed were "teaching alternate gender ideologies" and complained that she was "not able to find one book" in the Library System's collection that reflected a "conservative traditional view on gender."

167. Ms. Nuckolls disingenuously claimed that Ms. Young had lied when she explained that books could not be purchased for the Library System unless they were available through the two approved vendors.

168. Ms. Nuckolls concluded by stating, "[i]t is clear that our library director Ms. Young is an activist working to prevent evidence-based, well-researched books such as *Irreversible Damage* by Abigail Shrier from being available to parents who desperately need this information."

169. In addition to Ms. Nuckolls, nine other individuals spoke at the July 11, 2023, meeting of Defendant Commissioners Court. They read from or displayed eleven different books that contained LGBTQ+ content, claiming the books were "grooming children to be transgender" and demanded that the books entirely be removed from the MCMLS collection.

170. For instance, one pro-censorship and anti-LGBTQ rights activist, Tina Christofaro-Orebaug, mentioned two children's picture books published in 2019 and stated: "They are grooming our kids for pedophiles, that pedophiles are okay . . . they are reading these types of books in the library." She falsely claimed that *When Aidan Became a Brother* by Kyle Lukoff contained scenes in which the child's parents "castrated him." She also asked for children's picture

page book censorship guidance, and targeted books on the U.S. Civil Rights Movement, Jewish diarist Anne Frank, and American hero Martin Luther King Jr. *See Moms for Liberty Is Waging War on LGBTQ and Race-Inclusive Books*, GLAAD (Nov. 3, 2023), *https://glaad.org/moms-for-liberty-book-bans-anti-lgbtq/.*

books that contained LGBTQ+ content, such as *It Feels Good to be Yourself* by Theresa Thorn "to be taken out of the library" stating that while such books "seem very good" they are "really, really not good for our children."

171. Another pro-censorship and anti-LGBTQ rights activist, Lisa Palmer went even further and urged Defendant Commissioners Court to fire Ms. Young because she did not "emulate our views." Specifically, Palmer stated: "If I were to take one of these books [] and provide it to a kid to a minor, I would go to jail. You're not allowed to give sexually explicit books to kids, so why are we allowing it in our libraries . . . this is not to educate our kids, this is to indoctrinate our kids . . . there hasn't been that many LGBTQ trans kids in the last three years. Where's the history? There is none. The Bible actually says [] that it is better for a noose to be put around a man's neck and for him to be thrown in the depths of the sea if he causes a child to sin . . . and as far as this director, she should be fired. She should be. She does not emulate our views. We are conservative. Protect our kids."

172. At that same July 11, 2023, meeting, several commenters directed their criticism not just at specific books but at anyone who did not subscribe to their personal partisan, political, religious, or ideological viewpoints. They singled out individuals who spoke in support of marginalized communities or who held different identities, backgrounds, or beliefs.

173. For example, one pro-censorship activist, Holly Juno, freely expressed that her goal was to prevent access to LGBTQ+ content located *anywhere* in the library because it contained ideas with which she disagreed. "I didn't see anything in the children's section that I didn't agree with . . . but then I went upstairs to the adult section and found a book on transgender. And so according to my beliefs, we don't agree with transgender, and so I just wanted to remind everyone of the scripture in Genesis 1:27 that says so God created man in his own image, in the image of

God he created him, male and female, he created them. And so with that in mind and that this country is founded on, and the reason we came over here was because we wanted to worship God in our own ways, and so I just our country's founded on God's principles and I feel like that as we align our country with God . . . We should align our books with what we believe in God."

174. Following public comment, the Commissioners went into executive session on Agenda Item 19(A) to: "Consider, discuss, and deliberate the appointment, employment, evaluation, reassignment, duties, discipline, or dismissal related to the Director of the Montgomery County Memorial Library System."

175. At that time, Defendant Commissioners Court included Defendants Keough, Walker, and Gray in addition to Commissioners Noack and Riley.

176. In this executive session, members of Defendant Commissioners Court debated whether to strip Ms. Young of her role in reviewing book challenges and instead place that review in the hands of activists who shared similar anti-LGBTQ+ views.

177. Following the executive session, the Commissioners adopted three major changes to the Library System, which Defendant Keough's Deputy Chief of Staff, Jason Smith, later summarized as follows:

a. The purchasing director "was directed to expand the vendors available to the library so that balanced books could be purchased."

b. Ms. Young "was directed to organize books into 'like[]minded themes' and to not intermingle books (books with controversial topics) with other books in the library."

c. Ms. Young "was further instructed to place controversial books into an age-appropriate section and to prevent these books from being checked out by anyone under the age of 18."

d. As part of the Commissioners' attempt to separate books by "genres," they directed Ms. Young to segregate books that might include "explicit" or "questionable" materials by (1) marking those books so they could be easily identified, and (2) restricting the books so that no one under the age of 18 could access the books.

178. This system, under which Ms. Young was to segregate and restrict books that included "explicit" or "questionable" material, is referred to hereinafter as the "Genre System."

179. Ms. Young was "instructed to provide feedback to [Defendant Commissioners Court] as she worked through the process of making these changes."

180. Defendants designed and executed the Genre System to control the viewpoint of the MCMLS collection in a narrowly partisan or political manner and use their authority to restrict access to materials based on their anti-LGBTQ+ animus.

***Following the Imposition of the Genre System, Defendants Deepen their Conspiracy to Censor LGBTQ+ Books***

181. At and after the July 11, 2023, meeting—at which Defendant Commissioners Court adopted the Genre System—members of the public and Defendant Keough's staff further confirmed that the Genre System was created with the specific intent to target LGBTQ+ content, stigmatize LGBTQ+ people, and enforce an officially prescribed orthodoxy.

182. At the same meeting at which the Defendant Commissioners Court adopted the Genre System, Palmer opined that under the new Genre System, "anything that has to do with LGBT or gender identity or sexual" should be restricted to patrons eighteen and older while

holding up seven children's picture books and clarifying, "I don't want my kids to read [*When Aidan Became a Brother* by Kyle Lukoff] because I don't want them to think that's normal."

183. And that is the message that Defendant Commissioners also wanted to send, notwithstanding their own LGBTQ constituents and library patrons – that being LGBTQ was bad, wrong, sinful, and harmful.

184. Such a stigmatizing message from public officials and a public institution sends the message that the government is officially hostile to that constituency and that the constituency is not welcome to use government services.

185. On July 26, 2023, after the Genre System was adopted, G.R. Manager Mann emailed Ms. Nuckolls' in response to a "nice note" that Ms. Nuckolls left for her and promised that Defendant Keough's Office would continue to "chip away" at LGBTQ+ content in the Library System.

**Mann, Jean**

| | |
|---|---|
| **From:** | Mann, Jean |
| **Sent:** | Wednesday, July 26, 2023 10:55 AM |
| **To:** | Michele Nuckolls |
| **Subject:** | RE: [External] Pink, Blue and You, being catalogued |

Hi Michele,

Thank you for the nice note....so sweet. Yes, we will continue to chip away at this and let me know if I can be of further help to you.

Kind regards,

Jean Mann
Government Relations

Office of Montgomery County Judge Mark J. Keough

186. Later, on August 8, 2023, Ms. Nuckolls emailed G.R. Manager Mann, expressing concern that public comment time had been removed from the Court's agenda. In response, G.R.

Manager Mann assured her that the upcoming meeting of Defendant Commissioners Court would include a public comment period on library issues and also mentioned that she "attended the library consideration meeting yesterday. I can't say much other than it was very enlightening. More to come."

187. When Ms. Nuckolls thanked her, G.R. Manager Mann assured her that they were working towards the same goals, albeit behind the scenes: "You are more than welcome. We are on the same page it's just government wheels churn slowly. We are eating the elephant. Keep coming and sharing experiences."

188. From 2023 to present, Ms. Nuckolls also maintained regular contact, via texts and calls, with Defendant Keough's Deputy Chief of Staff, Jason Smith. These communications often centered on including more content critical of the LGBTQ+ experience in the library collection while removing books that reflected more positive or nuanced depictions of LGBTQ+ identities.

189. Ms. Nuckolls would flag LGBTQ+ books for removal and explain her strategies for challenging them. Rather than respond in writing, Deputy Chief of Staff Smith would frequently instruct her to "[c]all me if you are able," presumably to avoid creating a written record.

190. Deputy Chief of Staff Smith used these phone calls to coordinate efforts to censor LGBTQ+ content that promoted books exploring alternative sexual or gender identities.

191. In one exchange, Deputy Chief of Staff Smith asked Ms. Nuckolls if she "ha[d] a list that you are going to publish, or can send me" of all the LGBTQ+ books she intended to challenge.

192. Ms. Nuckolls confirmed that she had such a list and would send it.

193. Deputy Chief of Staff Smith thanked Ms. Nuckolls for taking lead on creating the list of LGBTQ+ books to censor, replying "I'll take all the help I can get!"

194. Like his staff, Defendant Keough himself was directly coordinating with pro-censorship, anti-LGBTQ+ rights activists to impose his narrow political and religious beliefs on the Library System.

195. On October 31, 2023, Ms. Nuckolls emailed Defendant Keough directly to thank him "for support in my advocacy with the library. The Tuttle Twins books are now in processing, and I am just beyond grateful. . . . I have been working on a policy with Jennifer Eckhart with Citizens Defending Freedom, and we have two sections that are ready for your review, if you would be so inclined. I believe that challenging the policy would help greatly."

196. Citizens Defending Freedom is another national organization dedicated to inculcating a singular religious belief system in all aspects of American culture, particularly encouraging school districts to encourage uniformity in favoring traditional gender and sexual roles.[37]

197. On November 3, 2023, Defendant Keough placed a phone call to Alexander Harris, a county resident notorious for promoting transphobic, Christian-supremacist rhetoric and advocating for censorship of books with which he personally disagreed.

198. During the call, Defendant Keough and Mr. Harris apparently discussed efforts to restrict access to books addressing topics such as the Big Bang Theory, the origin of life, evolution, and LGBTQ+ identities—topics Mr. Harris labeled as part of the "Religions of Atheism." In an email memorializing this conversation, Mr. Harris wrote: "Regarding Commissioners Court, I want to bring my knowledge and experience from battling books with sexually stimulating or

---

[37] *See generally* CITIZENS DEFENDING FREEDOM, https://www.citizensdefendingfreedom.com/blog-1/categories/exposing-transgender-ideology, (last visited July 11, 2025).

explicit content and LGBTQ ideology in Conroe ISD's libraries to our own county's public libraries, which are equally infected, if not worse."

199. Mr. Harris went on to applaud the Commissioners Court's July 11, 2023, decision to restrict access to materials he deemed unsuitable, characterizing these books as "explicit or questionable" because of their LGBTQ+ content, and supporting the designation and branding of such materials as 18+ age restricted. He further stated that a group of "like-minded constituents" planned to pressure Ms. Young to carry out the Court Commissioners' objective and that he would provide Defendant Keough with updates on their progress.

200. Mr. Harris' conversations with Defendant Keough were not limited to objections based on (what he perceived to be) "Atheism."

201. Mr. Harris complained to Defendant Keough about the book *Moonflower*, by Kacen Callender, because it discussed the concept of reincarnation, a belief that conflicted with Mr. Harris's personal religious views.

202. Mr. Harris also complained about a library employee's reference to "karma," claiming that because she "most likely believes in reincarnation," she should be removed from the committee responsible for reviewing book challenges.

203. Mr. Harris explicated his reasons for targeting any books that failed to condemn LGBTQ+ identities: "Again, please keep in mind our nation is built on Judeo-Christian values and the indoctrination of Atheism's LGBTQ ideology into our minor children will not be tolerated by the community."

204. Mr. Harris' objections to "reincarnation" and "karma," central tenants of eastern religions such as Buddhism, further demonstrated his desire to exclude materials reflecting religious minority perspectives, with the support and engagement of Defendant Keough.

205. Mr. Harris's phone calls with Defendant Keough and his staff reflected more than just the views of a private citizen, it reflects a coordinated effort by Defendant Keough and the Defendant Commissioners Court to advance a personal ideological agenda. The communication confirms that members of the Defendant Commissioners Court were not simply responding to community input but were actively exploiting the power of their offices to render the Library System hostile to a protected minority groups and to suppress access to books and ideas that conflicted with their narrow political, religious, and culture beliefs and working to reshape the Library System into a tool for promoting that agenda.

***Defendants Refuse to Define "Explicit" or "Questionable" for Ms. Young***

206. Following the implementation of the new Genre System on July 11, 2023, Ms. Young attempted to apply the Genre System neutrally and in accordance with her duties. However, the policy's vague, overbroad language posed significant challenges.

207. In December 2023, Ms. Young met with Commissioner Riley and Defendants Keough and Walker to provide an update on the implementation of the Genre System. She explained that clearer definitions of "questionable" and "explicit" would help to guide the process but reported that progress was being made. Despite her repeated efforts to obtain clarification, no guidance or further definitions were forthcoming.

208. Over the next several months, Ms. Young repeatedly asked county officials for clear definitions of the words "explicit" or "questionable."

209. In addition to meeting with Defendants, Ms. Young met with at least two assistant county attorneys, asking each for guidance on the meaning of the terms "explicit" or "questionable."

210. These assistant county attorneys acknowledged that the terms were too vague to define with precision and advised Ms. Young to use her best judgment.

211. In an attempt to comply with the Genre System without acting in a discriminatory manner, Ms. Young began relocating certain books she believed the Defendants would find objectionable into a newly created "Parenting" section. But she relocated other materials that she had no doubt would not be objectionable to Defendants to the Parenting section as well, seeking to avoid stigmatizing LGBTQ+ people and book content.

212. In addition to including standard parenting materials, this section now also contained children's books that addressed questions about gender identity, transitioning, and self-expression.

213. The vague and subjective nature of the Genre System had begun to create chaos. Pro-censorship activists began invoking the policy to demand the removal of any book with which they personally disagreed.

214. For example, Mr. Harris repeatedly demanded that Ms. Young remove hundreds of books from the Library System, not just the children's section, because he believed they contained "content that indoctrinates minors with the Transgender ideology."

215. Ms. Young responded to these inquiries by informing patrons about the Genre System's relevant procedures, identifying the books that had been moved to the "Parenting" section, and explaining that the recategorization process was a "massive project" that remained ongoing.

216. Despite these efforts, some pro-censorship activists attempted to bypass Ms. Young altogether, seeking to censor books without following the process established by the Genre System.

217. For example, Ms. Nuckolls began emailing Defendant Keough directly, complaining that she "ha[s] lost half of the book challenges this month" and imploring him to intervene. She urged him to "act swiftly and courageously for the children in our county," stating

that he could "blaz[e] new trails for other counties to follow" by preventing access to LGBTQ+ materials.

218. Meanwhile, Defendant Keough was actively engaging with individuals like Mr. Harris and Ms. Nuckolls, discussing what he described as the "indoctrination of our children with Atheism under the guise of science."

219. At the same time, Ms. Nuckolls texted Deputy Chief of Staff Smith to demand the removal of specific books she wished to suppress. Deputy Chief of Staff Smith, leveraging his position as Defendant Keough's Chief of Staff, acted to restrict or remove these books from the Library System without going through the formal challenge process altogether.

220. In January 2024, seven months after the Genre System's adoption, Commissioner Noack, acting on behalf of Defendant Commissioners Court, called Ms. Young to provide a working definition of which books qualified as "explicit" or "questionable," and therefore had to be segregated.

221. Commissioner Noack instructed Ms. Young to identify and classify as "explicit or questionable" any children's books that had any of the following topics: non-binary, LGBTQ, transgender, gender identity, and sexual orientation.

222. As overt hostility against LGBTQ+ individuals escalated, Ms. Young seriously began to fear for her job.

***Defendant Keough Reaffirms that Ms. Young is Meeting Her Job Expectations, While Simultaneously Plotting to Contrive Reasons to Fire Her***

223. As the volume and intensity of public attacks against her grew, largely in response to her refusal to indiscriminately restrict or eliminate all LGBTQ+ content from the Library System, Ms. Young became increasingly concerned that her association with and defense of this community could jeopardize her job.

224. On November 29, 2023, Ms. Young called Defendant Keough to check in on her job performance.

225. She noted that she had never received a formal performance evaluation and believed it was a good opportunity to check in with Defendant Keough directly.

226. During the call, Defendant Keough reassured her, stating "the way I see this, you're doing everything we've asked you to do. . . . so don't burn your braincells on this. . . . you have made a strong effort to . . . replace our books, and place them in the right spots and all that kind of stuff. You've done so far what we've asked you to do, and I thank you for that."

227. Ms. Young expressed concern about Mr. Hutson, who had been targeting her with public and private harassment ever since she raised concerns about his behavior during the book review meetings to Defendant Keough. She told Defendant Keough that she felt Mr. Hutson was unhappy with her and asked if he would consider facilitating a meeting between them.

228. Her concern stemmed from Mr. Hutson's public remarks during the July 11, 2023, meeting of the Defendant Commissioners Court, where he had openly criticized her during the public comment portion.

229. At that meeting, Mr. Hutson condemned the Library System's decision to purchase and retain LGBTQ+ content, referring to such books as "harmful" and suggesting that their availability in the collection might constitute criminal conduct.

230. He further stated that "Montgomery County is one of the most conservative counties in the state of Texas. But we have a library director that is providing children with access to" LGBTQ+ content, which he claimed had the ability to "damage them for the rest of their lives."

231. Mr. Hutson likened the harm of these books to imbibing illicit or unhealthy substances, claiming they were "more harmful to a developing child's mind than cigarettes and alcohol are to the body."

232. He concluded by attacking Ms. Young personally, stating that she had a "belief system and worldview that undermines the[]" values of "trust, respect, decency, and the protection of our children."

233. Mr. Hutson was eventually cut off for violating the rules of decorum, but Defendant Keough promised him that his comments were "to be continued."

234. Mr. Hutson's conduct on the reconsideration committee reflected the same extreme views he had expressed publicly, driven by a desire to enforce a rigid ideological standard in the Library System and to punish Ms. Young for supporting and advocating for LGBTQ+ people and content.

235. In response to Ms. Young's concerns, Defendant Keough acknowledged Mr. Hutson's ideological stance, stating "he's very much of an archconservative. He's got some strong black and white views . . . and I'm not saying I disagree with him."

236. Defendant Keough said he appreciated the call, and "if [he] th[ought] of anything, [he] would certainly call . . . [But] carry on, keep doing what you're doing, keep moving forward . . . an enriching, moral, upstanding community with family environment is all I'm wanting. I think that's one of the things that makes Montgomery County great."

237. Ms. Young ended the conversation by saying she enjoyed her job and did not want to lose it.

238. Defendant Keough chuckled in response and assured her "don't worry about that. Don't worry you're not in danger of that."

239. Contrary to his representations to Ms. Young, Defendant Keough was simultaneously plotting with Ms. Nuckolls and others to adopt a new book review policy for the Library System that would exclude Ms. Young and ultimately lead to her termination.

***Defendants Develop a New Reconsideration Policy to Skirt Ms. Young and Censor LGBTQ+ Content***

240. Even after the imposition of the Genre System, Defendants were still conspiring with community activists to further restrict access to LGBTQ+ books.

241. In 2023, Defendant Walker asked Ms. Young to meet with him and provide an update regarding the status of the implementation of the Genre Policy.

242. In attendance at this meeting were Ms. Young, Defendant Walker, and his then chief of staff Jeff Johnson.

243. At this meeting, Defendant Walker expressed that he did not agree with "that" lifestyle (referring to LGBTQ+ people), and he didn't think "those" books (referring to LGBTQ+ books), should be in the children's or young adults' section.

244. Defendant Walker was not the only one dissatisfied that adoption of the Genre Policy had not entirely eliminated all LGBTQ+ books from the library collection.

245. Dissatisfied with the pace and scope at which MCMLS was censoring LGBTQ+ content under the Genre System, on or around December 6, 2023, Ms. Nuckolls proposed a new Reconsideration of Library Materials Policy ("Reconsideration Policy") to members of Defendants Commissioners Court, which would remove Ms. Young from review decisions, and put all decision-making in the hands of anti-LGBTQ+ rights activists that were hand-picked by members of Defendant Commissioners Court.

246. Specifically, the proposed Reconsideration Policy would:

a. Create a five member "Citizens Review Committee," with each member being appointed by each member of Defendant Commissioners Court;

b. Channel all book challenges to the Citizens Review Committee; and

c. Permit the Citizens Review Committee to segregate and limit access to any book if, in its discretion, the book did not meet the "standards and values of the Montgomery County community."

247. In the view of Ms. Nuckolls and Defendants, the "standards and values of the Montgomery County community" (i.e., their officially prescribed orthodoxy) precluded a difference of opinion on the acceptance of sexual or gender identities or anyone advocating for non-discriminatory policies.

248. In order to ensure she and Defendants could weaponize the Citizens Review Committee to impose censorship on the Library System, Ms. Nuckolls recommended excluding librarians entirely from the Citizens Review Committee and making the Citizens Review Committee's decisions final and binding.

249. In the proposed Reconsideration Policy, Ms. Nuckolls also included examples of content that she believed should "not be in the children's section" such as anything related to "medical transition," "gender discussion/social transition," and quotes like "Scott taught me how to delete my search history so my mom wouldn't find out," or "Search, 'trans,' on YouTube and find bloggers who are trans."

250. Recognizing she and members of Defendant Commissioners Court had been able to leverage earlier ambiguous language in the Genre Policy to impose their own anti-LGBTQ+ agenda on the Library System, Ms. Nuckolls deliberately included vague and ambiguous

terminology in the proposed Reconsideration Policy – a proliferating tactic across the country because such policies are susceptible to biased implementation.

251. To wit, Ms. Nuckolls admitted that the ambiguity of terms like "grooming" would work in the Citizens Review Committee's favor. She wrote: "'any grooming language' may be too difficult to define and might not be able to be part of the policy. If so, this is where the [Citizens Review Committee] will come in."

252. The differences in how the proposed Reconsideration Policy treated challenges to adult's versus children's reading materials demonstrates the real motive girding the policy: The policy had nothing to do with ensuring balanced review, but rather as creating as a mechanism to restrict adolescents' access to positive or nuanced LGBTQ+ content.

253. In prior years, the process for reviewing books that were challenged was as follows:

a. For children's books that were challenged, the challenges were reviewed by a committee made up of five librarians and five civilians, each of whom were appointed by a different member of Defendant Commissioners Court;

b. For adult books that were challenged, the challenges were reviewed by a committee made up of five librarians; and

c. Regardless of whether the challenge was for a children's or adult's book, the review committee had the power only to make a recommendation to the Director of the Library System. The ultimate decision of whether to move or restrict access to the book was left to the discretion of the Director of the Library System.

254. Under the proposed Reconsideration Policy, the process for reviewing challenged books was to be as follows:

a. For children's, juvenile, young adult, and parenting books that were challenged, the book would be automatically removed from the general circulation and placed in the "Parenting" section until the Citizens Review Committee made a final ruling on the challenge. Librarians were prohibited from sitting on the Citizens Review Committee that reviewed challenges to children's books. The meetings of the review committee that reviewed challenges to children's books were closed to the public;

b. For adult books that were challenged, the book would remain in circulation unless and until the committee that reviewed adult books made a final decision to move or restrict access to the book. Librarians and other professionals were not prohibited from sitting on the committee that reviewed challenges to adult's books. In fact, the review committee consisted of five librarians including the Collection Development Coordinator; Branch Manager or Department Head, Adult Services Coordinator, Branch Coordinator or Library Director, and an additional librarian. The meetings of the review committee that reviewed challenges to adult's books were open to the public; and

c. Regardless of whether the challenge was to an adult's or children's book, the review committee had sole authority to move or restrict access to the book; the Director of the Library System was stripped of their decision-making authority in this regard.

255. This disparity between the review process for children's books and adult's books indicated that the purpose of the proposed Reconsideration Policy's was fashioned to facilitate censorship of disfavored LGBTQ+ content in children's books without librarian oversight or public transparency.

256. Ms. Nuckolls colluded with others in the drafting and creating of this proposed Reconsideration Policy.

257. In a meeting that included Defendant Keough, Deputy Chief of Staff Smith, and Ms. Young, Defendant Keough told Ms. Young that Deputy Chief of Staff Smith had worked on the proposed Reconsideration Policy.

258. In Defendant Keough's words, Deputy Chief of Staff Smith was qualified to work on the proposed Reconsideration Policy because he was working towards a master's degree in religion.

259. At that time, Deputy Chief of Staff Smith was pursuing his M.A. in Apologetics from Houston Christian University, a program designed to "develop students who are capable of defending the faith through biblical, cultural, and philosophical arguments. They serve their community and the Church successfully in a variety of vocations, including academic, parachurch, and ecclesiastical professions."[38]

260. Defendant Keough therefore decided to direct Deputy Chief of Staff Smith to assist in drafting the Reconsideration Policy in order to ensure that their shared religious beliefs were embedded in and served by the proposed Reconsideration Policy.

261. Defendant Keough himself played a hand in drafting the proposed Reconsideration Policy.

262. A comparison of early drafts of the policy reveals that when Defendant Keough proposed the Reconsideration Policy, he deleted the prior preamble, which had protected intellectual freedom by stating, "A citizen's right of free inquiry shall be protected against attempts

---

[38] *Master of Arts in Apologetics*, HOUSTON CHRISTIAN UNIVERSITY, https://hc.edu/school-of-christian-thought/degrees/maa/ (last visited August 6, 2025).

to abridge it" and replaced it with a new "purpose" section stating that the policy would "enable" the Commissioners "to exercise proper oversight of valuable library resources."

263. In March 2024, Ms. Young sent a detailed critique of the proposed Reconsideration Policy to the Montgomery County Attorney's Office and all Commissioners.

264. Ms. Young also sent a marked-up copy of Defendant Keough's proposed Reconsideration Policy with comments to Defendants Keough, Walker, and Gray, Commissioners Riley and Noack, and their Chiefs of Staff.

265. In total, Ms. Young included thirty-five comments identifying key issues with the proposed Reconsideration Policy, including:

a. The exclusion of the Library Director and Library Advisory Board from the drafting process, in contrast with past practice;

b. Inconsistencies with the "Purpose" section regarding residency, borrower status, and reading the entire work;

c. A lack of transparency, adult material reviews were open to the public, but Citizens Review Committee meetings for Children's, Young Adult, and Parenting materials would be closed to everyone except to the requestor;

d. Immediate restriction of materials based on one request amounted to unlawful censorship; and

e. The proposed Reconsideration Policy imposed substantial additional work on Library staff while simultaneously removing librarians from the process they had historically managed.

266. Under the proposed Reconsideration Policy, Ms. Young, as Library Director, had no statutory right to participate in policy development.

267. Ms. Young's official duties as Library Director did not include drafting or approving county policy, advising the Defendant Commissioners Court on policy matters, or engaging in legislative advocacy. She was not part of the team responsible for creating or implementing the proposed Reconsideration Policy.

268. The proposed Reconsideration Policy was a matter of public concern because it related to the manner in which Montgomery County residents could access books discussing controversial topics and marginalized identities.

269. Ms. Young also drafted and proposed her own Proposed Reconsideration of Library Materials Policy and shared her draft with all County Commissioners, their Chiefs of Staff, and the County Attorney's Office.

270. Her alternative proposal included eight detailed comments outlining an alternative process that maintained librarian involvement and complied with constitutional protections.

271. Despite her efforts, the Commissioners ignored Ms. Young's recommendations and concerns.

272. On March 25, 2024, Ms. Young met with Defendant Keough and Chief of Staff Millsaps to protest the proposed Reconsideration Policy.

273. During the meeting, Defendant Keough told Ms. Young that it was too late to make changes to the draft of the policy he had put forth.

274. Defendant Keough instructed Ms. Young that "at the end of the day, constitutionally, statutorily the Commissioners Court is ultimately responsible for this stuff."

275. Defendant Keough acknowledged Ms. Young's discomfort with the committee's power, adding, "I know you don't like that they have the potential to remove a book."

276. Chief of Staff Millsaps opined that he personally knew three of the five people that would assume positions on the proposed Citizens Review Committee "fairly well" and that he would be "surprised if you get them all in agreement to remove a book. You may get them all in agreement to lock it up, put it in a different section."

277. One of these people was Mr. Hutson, who would ultimately be elected Chair of the Citizens Review Committee.

278. Defendant Keough explained that the Citizens Review Committee was intended to insulate Defendant Commissioners Court, Library System staff, and Ms. Young from controversy. He described the committee as a tool to limit patron complaints and keep everyone else "out of trouble."

279. When Ms. Young asked what he meant by "trouble," Defendant Keough pointed to the recent controversies "in the public school system" and referenced an article that had appeared on the front page of *The Courier*."[39]

280. Ms. Young also raised a concern that books under review were not being returned. She specifically mentioned that *It's Perfectly Normal* was a book that "never came back."

281. In fact, two copies of *It's Perfectly Normal* had been checked out by G.R. Manager Mann and Mr. Hutson. Both of them refused to return the book, functionally removing it from the library collection – another increasingly common unliteral tactic utilized by pro-censorship activists across the country.

[39] Upon information and belief, Defendant Keough was referring to book banning at Conroe ISD. *See* Catherine Dominguez, *Conroe ISD will make its book banning process more transparent with faster updates*, THE COURIER OF MONTGOMERY COUNTY (Mar. 20, 2024), https://www.yourconroenews.com/neighborhood/conroe/article/conroe-isd-book-challenge-process-19209466.php

282. Defendant Keough responded that the Citizens Review Committee "may be protesting" by withholding and disappearing the book. He and Chief of Staff Millsaps then both laughed.

283. Defendant Keough then expressly admitted to the ideological backbone of the Citizens Review Committee, describing how "I represent a group of people that have ideological values that are different than others from that perspective and even my personal perspective I buy in with them on those things."

284. He concluded, "If we need to remove a book—or feel like we need to—everybody's not going to be in agreement. But we're not out there to burn books or to get rid of books."

285. Ms. Young responded diplomatically, saying, "Well you know we've already decided we're agreeing to disagree and are being friendly about it."

***Defendant Commissioners Court Adopts the Proposed Reconsideration Policy and Confirms that their Goal is to Censor LGBTQ+ Books***

286. Before and during the March 26, 2024, meeting of Defendant Commissioners Court, Defendants and several Montgomery County residents confirmed that the goal of the proposed Reconsideration Policy was to facilitate censorship of LGBTQ+ books.

287. The day before the meeting, Defendant Keough flagged for Ms. Young's attention two books that discussed gender identity with differing viewpoints.

288. Defendant Keough first asked Ms. Young whether the MCMLS collection still included *It's Perfectly Normal*, which he characterized as "that book that caused all this controversy to begin with" and asked, "We don't have it anymore, do we?" Ms. Young confirmed that the book remained in the adult section where it had always been shelved.

289. Defendant Keough then asked Ms. Young about *Elephants Are Not Birds*, published by Brave Books and shelved in the "Parenting" section, calling it "that one book about

gender identity." He suggested that the Citizens Review Committee might remove the current restriction on the book.

290. The contrast between the treatment of *It's Perfectly Normal* and *Elephants are Not Birds* highlights the ideological nature of the censorship effort. While *It's Perfectly Normal* was a source of controversy and placed in the adult section*, Elephants Are Not Birds,* a book promoting specific political and religious viewpoint on gender was welcomed and defended. The disparity illustrates that the concern was not with content, age-appropriateness, or educational value, but with the viewpoint expressed.

291. At the meeting itself, several Montgomery County residents who supported Defendant Keough's proposed Reconsideration Policy made clear that they interpreted the phrase "standards and values of the Montgomery County community" as a signal from the Defendant Commissioners Court that the Citizens Review Committee should be censoring LGBTQ+ content.

292. For example, Mr. Harris, wearing a shirt that proclaimed "Our Founding Fathers Were Not Atheist," stated that "the [Founding Fathers] built this nation on Judeo-Christian values." He claimed that atheism was influencing children with "sexually explicit and transgender content in our library materials."

293. Mr. Harris praised the proposed Reconsideration Policy as a "great step forward" toward censoring LGBTQ+ content.

294. He also expressed confidence that the proposed Reconsideration Policy would pass with a unanimous vote, stating it would "align[] with the Montgomery County standards and values."

295. Another activist, Deborah Ferris, downplayed concerns that the Reconsideration Policy amounted to book banning. She claimed that the intent was not to remove all books about sex, but rather to target "material that is inappropriate for children."

296. At the conclusion of the March 26, 2024, meeting, Defendant Commissioners Court voted 3-1 to adopt the proposed Reconsideration Policy

297. Even after the policy was enacted, Ms. Nuckolls continued to advise County officials on further changes to Library System policies. She proposed eliminating the review process entirely for certain book series, such as Brave Books and *Tuttle Twins*, solely because their content aligned with her personal ideological beliefs.

298. On April 4, 2024, Ms. Nuckolls emailed Deputy Chief of Staff Smith with further policy recommendations and requested that "Director Young could possibly be [left] in the dark." She suggested eliminating the requirement that books be vetted by reputable literary journals, noting that conservative and transphobic books often failed to meet those standards. The Deputy Chief of Staff responded enthusiastically, promising to discuss it with Defendant Keough and assuring her, "You're always welcome to suggest anything. We'll always tell you up front if it's something we can do or not at the current time."

***Defendants' Discriminatory Plan to Reshape the Library System Around Their Personal Beliefs Comes to Fruition with a Particular Design to Harm LGBTQ Individuals***

299. Upon passage of the Reconsideration Policy, activists began further exploiting the policy to instill on the wider community their own singular viewpoints.

300. For example, on September 10, 2024, one pro-censorship activist demanded to have the book *Colonization and the Wampanoag Story*, by Linda Combs, moved from the children's non-fiction section to the fiction section "beside other myths and fairytales. Preferably in the adult section."

301. As a basis, the requestor described the book as "written from a racist point of view," a "Nativist's Mein Kampf" and "attempts to explain history in a manner an ignorant simpleton would understand." The requestor disagreed with the book's characterization of Native Americans as "clean" and that it used pronouns such as "we" and "us."

302. Persuaded by the tirade against the author, Native Americans, and the Wampanoag, the Citizens Review Committee moved the book to the "fiction" section.[40]

303. Ms. Nuckolls expertly employed the Reconsideration Policy to inculcate her biased ideologies in the library collection. Around the time the Reconsideration Policy passed, Ms. Nuckolls wrote in a blog post that her "entire list of children's gender books have been removed" from MCMLS shelves. She wrote: "Every single book on my list was removed, which is surprising because many are so subtle, I never expected them to be moved."

304. Even after the removal of every book on her list, Ms. Nuckolls continued to push for further restrictions. Unsatisfied with partial victories, she sought to eliminate any remaining safeguards that might prevent her and the Defendants from fully controlling the Library System's content based on their personal subjective beliefs.

305. Ms. Nuckolls started by supporting the campaign of Defendant Ritch Wheeler, who was challenging then-Commissioner Noack, arguing that Defendant Wheeler would be a more reliably allied vote on issues related to the Library System.

306. At the July 2, 2024, meeting of Defendant Commissioners Court, Ms. Nuckolls asked whether the appointment of a new member to the Citizens Review Committee was still on the agenda. In response, Defendant Keough said that the item was moved to the consent agenda

---

[40] This removal came after the modifications to the Library System's review policy described above.

and advised Ms. Nuckolls to keep an eye out for "when we come to that portion. Ya, we got something that's going to happen here."

307. Tipped off that Defendant Commissioners Court had something up its sleeve, Ms. Nuckolls proceeded to publicly comment on the candidate whose nomination to the Citizens Review Committee was pending. In those comments, Ms. Nuckolls revealed that she was coordinating with Defendant Wheeler, who was recently elected to replace then-Commissioner Noack, and she asked Defendants Commissioners Court to "defer [appointing a new member of the Citizens Review Committee] until [Defendant] Wheeler takes office, and allow him to choose a true conservative" to the Citizens Review Committee. She opposed the pending nominee to the Citizens Review Committee because she owned a bookstore that stocked LGBTQ+ books.

308. Ms. Nuckolls claimed she wanted a "true conservative" on the Citizens Review Committee, meaning she believed the new Commissioner would be even more inclined to censor books she disfavored, and that Defendant Wheeler would appoint Ms. Nuckolls' chosen committee candidate once he took office.

309. In response, Defendant Keough confirmed that he was planning to defer the appointment of the new appointee to the Citizens Review Committee to ensure Ms. Nuckolls's chosen "true conservative" could be appointed by Defendant Wheeler (rather than by then-Commissioner Noack) when he took office, and Defendant Commissioners Court therefore deferred the decision of who to appoint to the Citizens Review Committee.

310. During this period, Ms. Young frequently criticized the new Library System policies.

311. For instance, whenever Ms. Young met with Elizabeth Sargent, the Technical Services Manager at the Library System, Ms. Young criticized the Reconsideration Policy.

312. Ms. Sargent had knowledge of Ms. Young's transgender child.

313. Given their disagreement over the Reconsideration Policy, among other things, Ms. Sargent submitted a complaint against Ms. Young to Defendant Keough's office, complaining that Ms. Young harbored and expressed divergent views on the matter.

314. Ms. Young also shared similar concerns with Andrea Yang (the Library System's Acquisitions Manager), Lynn DeLeon (the Library System's Assistant Director), Lana Bearthard (the Library System's business manager), and every branch manager in the Library System.

315. Several Commissioners instructed Ms. Young to fire Ms. Yang after Ms. Yang posted criticism of the Commissioners' new policies and advocated for LGBTQ+ individuals on her personal social media sites. Ms. Young declined to do so because Ms. Yang's activities were also protected, just like Ms. Young's.

***Defendants Conspire To Fire Ms. Young Because She Refused to Carry Out their Plan To Impose an Officially Prescribed Orthodoxy***

316. By the end of 2024, the pressure to terminate Ms. Young for her refusal to participate in censorship and her defense of LGBTQ+ individuals and content reached a boiling point.

317. Defendant Wheeler won his election against Commissioner Noack, giving Ms. Nuckolls the more reliably "true conservative" vote she sought.

318. Around January 27, 2025, Ms. Young met with Defendant Wheeler and his Chief of Staff, Matt Beasley.

319. During this conversation, Ms. Young reviewed with them the directives from the June 11, 2023 meeting of Defendant Commissioners Court (which took place prior to Defendant Wheeler's appointment). When Ms. Young described Defendant Commissioners Court's Genre System directive, she explained that it was clearly intended to "move the LGBTQ books."

320. Defendant Wheeler responded, "Right. Out of the children's section, which I'm okay with, by the way."

321. When Defendant Wheeler asked Ms. Young, "Did you get the children's section in line with what the County wanted?," his question confirmed that the Defendant County Commissioners—not just private activists—were driving the ideological purge.

322. Ms. Young explained that she couldn't get a definition for "explicit" or "questionable" content until January 2024, when Commissioner Noack finally informed her that those words encompassed all LGBTQ+ books and to pull them. Defendant Wheeler replied, "Nobody wants to be on the hook" for unlawful censorship.

323. Defendant Wheeler then stated, "For what [the County] asked you to do, you're pretty much done. We're still getting feedback though from whether it be Two Moms and Some Books or whoever else and we also have this issue going on inside with employees . . . it just seems like it's gotta be linked."

324. During that meeting, Ms. Young and Defendant Wheeler also discussed the Texas Library Association conference. Defendant Wheeler warned Ms. Young not to send staff due to dislike of programming related to LGBTQ rights and literature such as sessions titled: *Debunking Misinformation about Trans People and Identities, LGBT Authors of Young Adult Literature*, and *How to Create Inclusive Library Programming*.

325. Following this meeting with Ms. Young, on January 28, 2025, Defendant Commissioners Court held a regular session meeting to "consider, discuss, and deliberate the appointment, employment, evaluation, reassignment, duties, discipline, or dismissal of Library Director. (Section 551.074)."

326. Ms. Nuckolls spoke at this meeting reiterating her frustrations, arguing that Ms. Young had failed to fully carry out the Commissioners' directives and falsely accusing Ms. Young of ordering books "promot[ing] bottom surgery" while failing to replace lost or damaged copies of Brave Books."[41]

327. Following public comment, Defendant Commissioners Court entered executive session, at which time it considered whether to fire Ms. Young.

328. Following this executive session, Defendant Commissioners Court resumed its regular session meeting, at which Defendant Gray moved to appoint Defendant Keough to oversee the Library System. Members of Defendant Commissioners Court voted unanimously in favor of the motion, appointing Defendant Keough as Director of the Library System.[42]

329. Per Defendant Montgomery County, the Director of the Library System was supposed to have myriad qualifications, including:

**Education, Experience and Skill Requirements**

- Master of Library Science degree or equivalent from an ALA accredited program required
- At least 7-10 years' experience working in a public library setting including working in an administrative role
- Knowledge of integrated library systems and current technologies that improve citizen involvement
- At least 3 years of experience in budgets, planning and allocating of public resources required
- At least three years of supervisory experience of professional staff
- Requires experience in MS Word and Excel
- Must have general knowledge of office related products such as computer, calculator, copier, etc.
- Computer knowledge of SirsiDynix Symphony automation software modules or alternative ILS system preferred

---

[41] This an apparent reference to the fact that Brave Books are poorly bound and often fall apart quickly in library circulation. *See also The Bear Essentials of Fatherhood*, BRAVE BOOKS, https://bravebooks.us/products/the-bear-essentials-of-fatherhood (last visited July 11, 2025) (reviews from customers indicating the books damage easily and are "a bit underwhelm[ing]"). This concern over durability of books lacking library binding was part of the reason the Library System policy did not permit the expenditure of public funds on books that were not reviewed by approved vendors.

[42] Defendant Commissioners Court did not immediately clarify whether it had fired Ms. Young from her role as Director of the Library System.

330. Despite Defendant Commissioners Court appointing him as the new Director of the Library System, Defendant Keough did not meet the minimum job requirements, including but not limited to:

a. He did not have a Master of Library Science degree of equivalent;

b. He did not have 7-10 years' experience working in a public library setting; and

c. He did not have knowledge of integrated library systems and current technologies that improve citizen involvement.

331. Later that day, Defendant Keough purported to fire Ms. Young.

332. His decision was rooted in his animus towards the LGBTQ+ community and in retaliation against Ms. Young for associating with and defending them, as well as for refusing to participate in unlawful discrimination and unconstitutional censorship.

333. When Ms. Young asked Defendant Keough why she was being terminated, Defendant Keough responded that she "kn[e]w why." When asked again, he said, "that's all I'm going to say. It's not in the best interests of what we're trying to do," referring to their agenda of segregating, stigmatizing, and censoring LGBTQ+ content.

334. In a public statement, Defendant Keough later said, "The future of the [L]ibrary [S]ystem is vital to me and I will immediately begin a nationwide search for a new Library Director that shares the values of the community and respects the direction of Commissioners Court who represents the people of this county."[43]

[43] Anayeli Ruiz, *Librarian's sudden termination highlights tensions over Montgomery County library policies*, KHOU-11 (Feb. 6, 2025), https://www.khou.com/article/news/local/montgomery-county-librarian-fired/285-6dd47dab-b0d6-48dc-b279-4ff5398f6ca7.

335. The "values of the community" and "direction of Commissioners Court" to which Defendant Keough referred were intended to signal the shared goal of censoring LGBTQ+ content and punishing those who opposed censorship and discrimination.

336. Between Defendant Keough taking the role of acting Library Director, and Defendant Commissioners Court's voting to affirm her termination, Ms. Young spoke out publicly about the circumstances leading up to her termination, including interviews with local news outlets.[44]

337. At the February 11, 2025, meeting of Defendant Commissioners Court, the item to officially affirm the termination of Ms. Young was listed on the consent agenda.

338. During the public comment period, Ms. Young addressed the Defendant Commissioners Court to highlight her accomplishments during her twenty-eight-month tenure as Library Director. She also pointed out that:

a. She had "consistently followed the Court-approved library collection policy, which outlines the Library's responsibility to reflect a diverse range of perspectives, including those which do not align on topics with your personal beliefs, or the personal beliefs of a couple outspoken members of the community;

b. "Unfortunately, some have been making false claims, accusing the Library of not purchasing conservative or Christian books. That is an outright lie;"

---

[44] Anayeli Ruiz, *Librarian's sudden termination highlights tensions over Montgomery County library policies,* KHOU11 (Feb. 6, 2025), https://www.khou.com/article/news/local/montgomery-county-librarian-fired/285-6dd47dab-b0d6-48dc-b279-4ff5398f6ca7; *Catherine Dominguez*, *Top Montgomery County librarian says surprise firing was political*, HOUSTON CHRONICLE https://eedition.houstonchronicle.com/infinity/article_popover_share.aspx?guid=84635aa0-22fb-4b0f-99b6-533a05328d0e&share=true (last visited July 11, 2025); Ivy Lopez, *Montgomery County Library Director Fired Amid Political Controversy*, CONROE NEWS (Feb. 10, 2025), https://www.conroenews.org/article/montgomery-county-library-director-fired-amid-political-controversy.

c. "In July 2023, less than 1% of the Library System's collection consisted of LGBTQ titles. While a 2024 study by the Williams Institute shows 4.1% of Texans identify as LGBTQ, with 29% of those having children;"

d. "As a librarian, my duty has always been to protect everyone's right to read, and to uphold democratic values, free speech among them;"

e. She carried out her duties "with integrity, and that includes your vague directive to move 'questionable' and 'explicit' material to restricted areas;" and

f. Ms. Young closed by urging the Library System to reinstate her.

339. After multiple community members spoke in eloquent support of Ms. Young, Defendant Commissioners Court moved the item into executive session, disregarding the very "community values" they claimed to uphold and ignoring the public input they solicited.

340. The Commissioners' decision to move the matter into executive session was a deliberate attempt to avoid public accountability and conceal the real reason for Ms. Young's termination, which was to punish her for refusing to censor LGBTQ+ content and for defending the rights of the LGBTQ+ community.

341. Behind closed doors, the Commissioners deliberated and returned to open court and voted 4-1 to reaffirm Ms. Young's termination. Defendants Walker, Wheeler, Gray and Keough voted in favor, while Commissioner Riley voted against it.

342. Commissioner Riley publicly stated that he could not, in good conscience, support the termination of Ms. Young. Defendant Walker acknowledged that the issue had been weighing on Commissioner Riley's mind, confirming that some within the Court recognized the termination was unjust and politically motivated.

***Community Members Across the Political Spectrum Condemn Ms. Young's Firing as Unlawful and Discriminatory***

343. Since Ms. Young's termination, community members from a wide range of political backgrounds have voiced outrage, recognizing that she was fired for associating with and defending members of the LGBTQ+ community.

344. One volunteer at Central Branch Library in Conroe raised concerns that Ms. Young was fired without any documented performance issues, calling the decision baseless and unfair.

345. Other residents criticized Defendant Keough's actions as a "politically motivated" attempt to restrict content in the Library System. One patron expressed concern that the next Library System director would be chosen to serve only the interests of the "conservative" residents, instead of all residents, stating, "Ensuring all viewpoints are represented in our public library will not be accomplished by hiring someone who pledges allegiance to one political party or the other."

346. These statements confirm what many in the community already understood: Ms. Young was fired to make room for a compliant replacement, one who would assist Defendants in effectuating conformity of thought and help them foist their subjective, personal worldviews on the entire community.

***Defendants Further Prescribe What Shall be Orthodox in Politics and Religion in the Library System Following Ms. Young's Termination***

347. Following Ms. Young's termination, Defendant Keough's staff further confirmed that her termination was motivated by Defendants' anti-LGBTQ+ animus.

348. Staff from Defendant Keough's office reassured community members that he would continue working to censor content that expressed viewpoints with which he disagreed.

349. For example, one community member emailed Defendant Keough's Administrative Assistant to complain that many board books in the Library System were "pushing an agenda" because of their depictions of "non-traditional families:"

**From:** [redacted]
**Sent:** Thursday, February 13, 2025 2:31 PM
**To:** Cojudge Public <cojudge@mctx.org>
**Subject:** [External] Tullis Library

CAUTION: This email originated from outside of Montgomery County, Texas! Do not click links, open attachments or reply unless you recognize the sender's email address and know the content is safe!

---

Hello,
it is not the job of a library to teach a 2 year old about non-traditional families. I need to be the one to teach my daughter and do not appreciate the agenda being pushed to 2 year olds in the board book section of Tullis library. This section does not have many books and most are pushing an agenda. Someone needs to go through these books. They are not age appropriate.
Thank you,
Concerned Montgomery County Mom

350. In response, his personal assistant confirmed that Defendant Keough was aware of "the issue" and in the process of hiring a new Library Director:

**Sutton, Kimberly**

**From:** Cojudge Public
**Sent:** Thursday, February 13, 2025 2:48 PM
**To:** [redacted]
**Subject:** RE: [External] Tullis Library

Thank you for emailing our office and for your concerns. County Judge Keough is aware of the issue and is in the process of hiring a new library director in the next couple of weeks.

Have a blessed day!

Kimberly Sutton
Administrative Assistant II

**Office of County Judge Mark J. Keough**
501 N. Thompson, Suite 401
Conroe, Texas 77301
Conroe: 936-539-7812
Houston: 281-364-4285
kimberly.sutton@mctx.org

351. In March 2025, Defendant Commissioners Court appointed Janna Hoglung as the new Library Director.

352. Following Ms. Young's termination, Defendants directed Library System personnel to move all LGBTQ+ content to the "Parenting" section and restrict their access to patrons age 18 and older.

353. In April 2025, Ms. Nuckolls publicly thanked Defendants Keough, Gray, Walker, and Wheeler for donating Brave Books to MCPLC, calling Defendant Keough one of the original donors and praising them for being "incredibly supportive for Christian and conservative children's literature being included in our public libraries."

354. Since her termination, Ms. Young has been seeking, but unable to secure, a job that is similar to her previous role as Library Director.

## CLAIMS FOR RELIEF

### FIRST, SECOND, AND THIRD CLAIMS FOR RELIEF
**Discrimination, Retaliation, and Anticipatory Retaliation on the Basis of Sex in Violation of the Equal Protection Clause, Brought Through 42 U.S.C. § 1983**
**(Against All Defendants)**

355. Ms. Young hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

356. At all times relevant to this claim, Defendants were acting under color of state law.

357. The Equal Protection Clause of the Fourteenth Amendment to the U.S. Constitution protects individuals who oppose discriminatory practices against, advocate on behalf of, and associate with protected classes. Likewise, the Equal Protection Clause protects individuals who make it reasonably apparent that they will continue to engage in such protected activities.

358. The Equal Protection Clause recognizes sex as a protected class. With respect to sex, the Supreme Court in *Bostock v. Clayton County, Georgia* held that "discrimination based on homosexuality or transgender status necessarily entails discrimination based on sex . . . ." 590 U.S. 644, 679 (2020); *see also Olivarez v. T-mobile USA, Inc.*, 997 F.3d 595, 598 (5th Cir. 2021) (applying *Bostock*).

359. At all times relevant to this claim, Ms. Young enjoyed federal rights to oppose discriminatory practices against protected LGBTQ+ individuals; associate with protected classes; advocate on behalf of protected classes; and made it reasonably apparent that she had engaged in such protected conduct or would do so in the future.

360. As alleged herein, Defendants Montgomery County, Commissioners Court, Keough, Walker, Wheeler, and Gray had final policymaking authority from Defendant Montgomery County when they discriminated against, retaliated against, and engaged in anticipatory retaliation against Ms. Young because of her opposition to sex-based discriminatory practices, her association with and advocacy on behalf of such protected classes, and the expectation that she would continue engaging in such protected activities in the future.

361. As alleged herein Defendants Montgomery County, Commissioners Court, Keough, Walker, Wheeler, and Gray were an affirmative link and a causal connection to the discrimination, retaliation, and anticipatory retaliation carried out by the above-listed final policymakers.

362. Defendants Montgomery County, Commissioners Court, Keough, Walker, Wheeler, and Gray had control of employment and operational decisions within the Library System and intentionally exercised that control to discriminate and retaliate against Ms. Young.

363. At all times relevant to this claim, it was clearly established that supervisors and commissioners could not deny an employee's right to equal protection under the laws of the United States by discrimination and retaliating against employees on the basis of their sex-based opposition, advocacy, and association. Any reasonable supervisor or commissioner acting under color of state law knew or should have known of these clearly established rights.

364. Among other acts of discrimination and retaliation alleged herein, Defendants Keough, Walker, Wheeler, and Gray were antagonistic towards Ms. Young and her protected activities, encouraged others to be so as well, and ultimately terminated Ms. Young's employment.

365. Defendants' discriminatory animus towards LGBTQ+ community members and Ms. Young's protected activities were the but-for cause of Defendants' discrimination and retaliation.

366. Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. Young's federally protected rights.

367. As a result of Defendants' conduct, Ms. Young suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

**FOURTH AND FIFTH CLAIMS FOR RELIEF**
**Discrimination and Retaliation against Protected Speech and Association in Violation of the First Amendment, Brought Through 42 U.S.C. § 1983**
**(Against All Defendants)**

368. Ms. Young hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

369. At all times relevant to this claim, Defendants were acting under color of state law.

370. At all times relevant to this claim, Ms. Young enjoyed the First Amendment rights to engage in speech on matters of public concern; be free from state action that deters, and chills protected speech; and to associate freely.

371. At all times relevant to this claim, Ms. Young was entitled to oppose unconstitutional censorship and discrimination, without reprisal.

372. As alleged herein, Ms. Young opposed, spoke out against, and refused to comply with unlawful and unconstitutional censorship, both in private and publicly.

373. Ms. Young was not responsible for making determinations about freedom of speech and the unlawfulness of the Library System's removal, segregation of, and censorship of categories of books, nor was she responsible for policymaking decisions regarding the Library System's collection including the removal and censorship of categories of books.

374. As a public employee, Ms. Young's job duties did not (nor could they) include systematic suppression of the First Amendment rights of Library System patrons by censoring books based on disfavored content or their association with historically marginalized minority groups, nor did they include engaging in systematic discrimination against a discrete group of library users.

375. Ms. Young's raising of concerns and criticism of Defendants and their restrictions on speech and association were outside the scope of her job duties.

376. Ms. Young's critiques of the Library System's Collection Development, Materials Selection, Materials Challenge, and Reconsideration of Library Materials policies were outside the scope of her job duties.

377. Ms. Young's speech on those subjects did not contribute to or facilitate her performance of duties for the Library System.

378. The suppression of speech and association in public libraries is also a matter of public concern.

379. As alleged herein, Defendants Montgomery County, Commissioners Court, Keough, Walker, Wheeler, and Gray had final policymaking authority from Defendant Montgomery County when they retaliated and discriminated against Ms. Young intending to chill and deter her protected speech and association.

380. As alleged herein, Defendants Montgomery County, Commissioners Court, Keough, Walker, Wheeler, and Gray were an affirmative link and a causal connection to the discrimination and retaliation carried out by the above-listed final policymakers.

381. Defendants Montgomery County, Commissioners Court, Keough, Walker, Wheeler, and Gray had control of employment and operational decisions within the Library System and exercised that control to discriminate and retaliate against Ms. Young.

382. Specifically, Defendants engaged in viewpoint discrimination and retaliation, that is, they engaged in censorship based on their disagreement with the *content* of Ms. Young's protected speech and association. Viewpoint discrimination is presumptively unconstitutional and subject to strict scrutiny.

383. At all times relevant to this claim, it was clearly established that supervisors and commissioners could not discriminate and retaliate against public employees who engage in protected speech and association because of disagreements with their viewpoints. Any reasonable supervisor or commissioner acting under color of state law knew or should have known of these clearly established rights.

384. Among other acts of discrimination and retaliation alleged herein, Defendants were antagonistic towards Ms. Young and her protected activities, encouraged others to be so as well, and ultimately terminated Ms. Young's employment.

385. Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. Young's federally protected rights.

386. The value of Ms. Young's speech outweighed any legitimate governmental interest. Indeed, Defendants' discrimination and retaliation against Ms. Young was intentional, vexatious, willful and wanton, in total disregard for her rights, and not in furtherance of any legitimate governmental interest. Defendants' non-discriminatory and non-retaliatory reasons for their conduct are pretextual.

387. As a result of Defendants' discrimination and retaliation, Ms. Young suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

**SIXTH CLAIM FOR RELIEF**
**Conspiracy under the Ku Klux Klan Act in**
**Violation of 42 U.S.C. § 1985(3)**
**(Against Defendants Keough, Walker, Wheeler, and Gray)**

388. Ms. Young hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

389. Although not necessary for a Section 1985 claim, at all times relevant to this claim, Defendants Keough, Walker, Wheeler, and Gray were acting under color of state law.

390. Defendants Keough, Walker, Wheeler, and Gray from conspired with each other and with pro-censorship, anti-LGBTQ rights activities to fire Ms. Young for advocacy on behalf of members of the LGBTQ+ community, and for her refusal to carry out Defendants' censorship demands discriminating against specific minority populations.

391. Section 1985(3) prohibits when "two or more persons in any State or Territory conspire . . . for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws[.]"

392. Ms. Young brings this claim under both the "deprivation" clause and the "hindrance clause" of Section 1985(3) in that Defendants conspired both to deprive a person or class of persons equal privileges and protection of the law as described above and conspired for the purpose of preventing or hindering Ms. Young from securing the same to all persons within the state.

393. At all times relevant to this claim, Ms. Young enjoyed those rights previously alleged, including the rights to equal protection under the laws of the United States and the rights to oppose discriminatory practices, advocate and associate with LGBTQ+ community members, and to engage in protected speech pursuant to the First Amendment.

394. As alleged herein, Defendants plotted, coordinated, and executed a common plan with each other to engage in discrimination, retaliation, obstruction, intimidation, and threats against LGBTQ+ community members, and Ms. Young by association and advocacy for them, in violation of Ms. Young's rights and those of others in their community.

395. As alleged herein, in furtherance of their conspiracy to deprive Ms. Young and others of equal protection or equal privileges and immunities under the Fourteenth Amendment, Defendants acted on class-based animus and engaged in acts of intimidation, threats, discrimination, and retaliation.

396. As alleged herein, together, Defendants conspired to prevent and hinder Ms. Young, from giving or securing to all patrons of the Library System their constitutional rights and equal protection of the law.

397. The illegal activities described above were undertaken by Defendants as overt acts pursuant to an unlawful conspiracy, the purpose of which was to both hinder Ms. Young in giving or securing to all persons equal protection of the laws, and to oppress, harass, and stigmatize LGBTQ+ community members in violation of the Fourteenth Amendment, and through them Ms. Young, in violation of the rights guaranteed by the Constitution and laws of the United States.

398. The conspiracy was motivated by a class-based invidious discriminatory animus.

399. The conspiracy was aimed at interfering with rights that by definition are protected against private, as well as official, encroachment.

400. The illegal activities described above were undertaken by Defendants in furtherance of their personal animus towards LGBTQ+ community members.

401. At all times relevant to this claim, it was clearly established that commissioners and supervisors could not engage in conspiracies to deprive public employees of these rights. Any reasonable commissioner or supervisor acting under color of state law knew or should have known that such conspiracies were clearly unlawful.

402. As a result of Defendants' conduct, Ms. Young suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

**SEVENTH, EIGHTH, AND NINTH CLAIMS FOR RELIEF**
**42 U.S.C. § 2000e *et seq.***
**Discrimination, Retaliation, and Anticipatory Retaliation on the Basis of Sex in Violation of Title VII of the Civil Rights Act of 1964**
**(Against Defendant Montgomery County)**

403. Ms. Young hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

404. Ms. Young alleges claims under Title VII of the Civil Rights Act of 1964 similar in nature, including associational, advocacy, and retaliatory discrimination (including anticipatory retaliation), as those described in the claims under 42 U.S.C. § 1983 for sex (including sexual orientation and gender identity) discrimination.

405. Among other acts of discrimination and retaliation alleged herein, Defendants were antagonistic towards Ms. Young and her protected activities, encouraged others to be so as well, and ultimately terminated Ms. Young's employment.

406. Defendants' discriminatory animus towards protected classes was a motivating factor of Defendants' adverse actions against Ms. Young, and their retaliatory animus was the but-for causation for the same.

407. Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. Young's federally protected rights.

408. As a result of Defendants' conduct, Ms. Young suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

**TENTH CLAIM FOR RELIEF**
**Violations of the First Amendment Establishment Clause,**
**Brought Through 42 U.S.C. § 1983**
**Government Endorsement and/or Favoring of One Religion**
**Over Other Religions or Non-Religion**
**(Against All Defendants)**

409. Ms. Young hereby incorporates all other paragraphs of this Complaint as if fully set forth herein.

410. At all times relevant to this claim, Defendants were acting under color of state law.

411. The Establishment Clause prohibits the government from taking actions that endorse, advance, or impose religious doctrine, show preference for any particular religion or religious beliefs in general.

412. Specifically, the Establishment Clause prohibits any practice that "make[s] a religious observance compulsory." *Kennedy v. Bremerton Sch. Dist.*, 597 U.S. 507, 537 (2022) (quotations omitted). Examples include when a school broadcasts prayers over a public address system at a football game. *Id*. at 542. This impermissible coercion is especially present when a government entity imposes discipline on those who do not participate in the religious practices being imposed by the government. *Cf. id*. (discussing how coercion was less likely when students were not punished for forgoing an invitation to pray).

413. Government provided benefits, including access to public library resources, cannot be conditioned on someone sharing, or participating in, the government's preferred religion. *Id.*

414. The Montgomery County Memorial Library System (MCMLS) and its collections constitute a public benefit, and any decisions about the scope and accessibility of that collection must comply with the Establishment Clause.

415. Defendants acted to shape the Library System's collection in a way that that endorsed, advances, or favored one particular limited religious ideology, specifically a narrow and sectarian interpretation of Christianity, over other Christian denominations, other religions and other religious beliefs, and non-religious perspectives.

416. As alleged herein, Defendants sought to compel Ms. Young to censor or exclude content, including LGBTQ+ content, based on the belief that such material was inconsistent with their preferred religious doctrine.

417. When Ms. Young refused to adopt or enforce viewpoint-based censorship policies grounded in Defendants' religious ideology, Defendants revised the Reconsideration Policy and terminated Ms. Young in order to impose their religiously motivated agenda in the Library System.

418. These actions were taken to ensure that public library collection and access decisions aligned with and promoted Defendants' preferred religious beliefs, to the exclusion of others, in violation of the First Amendment.

419. At all times relevant to this claim, Ms. Young had a constitutional right to oppose government actions that improperly endorsed, advanced, or imposed religious doctrine in a public institution.

420. Defendant Keough, as a final policymaker for Defendant Montgomery County, exercised control over the Reconsideration Policy and Library System operations in furtherance of an unconstitutional goal: to shape public resources in line with a particular religious belief.

421. Defendant Keough and other Defendants used their control over hiring, policy, and personnel to advance and institutionalize religious preferences within the Library System.

422. At all times relevant to this claim, it was clearly established that the government may not favor one religion, religious sect, or religious viewpoint over others, or over non-religion, when administering public services, including public libraries.

423. Defendants terminated Ms. Young's employment in order to remove an impediment to their efforts to implement religiously motivated censorship in the Library System.

424. Defendants' actions, including revisions of library policies and Ms. Young's termination violated the Establishment Clause of the First Amendment.

425. Defendants' actions, as alleged herein, were undertaken with malice or reckless disregard for Ms. Young's federally protected rights.

426. The value of Ms. Young's rights under the Establishment Clause outweighed any legitimate governmental interest. Indeed, Defendants' violation of the Establishment Clause was intentional, in reckless or callous disregard for Ms. Young's federally protected rights, and not in furtherance of any legitimate governmental interest. *See Epperson v. State of Ark.*, 393 U.S. 97, 107 (1968) (quoting *Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 505 (1952)) ("[T]he state has no legitimate interest in protecting any or all religions from views distasteful to them").

427. As alleged herein, Defendants' actions were based on the religious views of some Montgomery County residents, which they elevated above other beliefs and identities through official action.

428. As a result of Defendants' violations of the Establishment Clause, Ms. Young suffered actual economic damages and suffered other injuries, damages, and losses, including severe emotional distress and pain and suffering in an amount to be proved at trial.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff respectfully requests that this Court enter judgment in her favor and against Defendants, and award her all relief as allowed by law, including but not limited to the following:

a) All declaratory relief and injunctive relief, as appropriate;

b) Actual economic damages, including but not limited to back pay, front pay, and lost benefits, as established at trial;

c) Compensatory damages, including but not limited to those for future pecuniary and non-pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, and other non-pecuniary losses;

d) Punitive damages for all claims as allowed by law, to the maximum amount permitted and in an amount to be determined at trial;

e) Prejudgment and post-judgment interest at the highest lawful rate;

f) A tax-offset;

g) Attorneys' fees and costs; and

h) Such further relief as justice requires, including further injunctive relief against all Defendants to cease and desist from discrimination, retaliation, and censorship.

Date: August 25, 2025

Respectfully submitted,

*/s/ Iris Halpern*
Iris Halpern*
Colo. State Bar No. 53112
Azra Taslimi*
Colo. State Bar No. 44317
Stephanie Wise*
Colo. State Bar No. 60626
Neil Sandhu*
Colo. State Bar No. 56600
RATHOD | MOHAMEDBHAI LLC
2701 Lawrence Street
Denver, CO 80205
Telephone: (303) 578-4400
Facsimile: (303) 578-4401
ih@rmlawyers.com
at@rmlawyers.com
sw@rmlawyers.com
ns@rmlawyers.com

** Pro Hac Vice Pending*

*/s/ Katherine P. Chiarello*
KATHERINE P. CHIARELLO
State Bar No. 24006994
Southern District Federal Bar No. 31941
Botkin Chiarello Calaf PLLC
1209 Nueces Street
Austin, Texas 78701
Tel. 512-615-2341
Fax. 737-289-4695
katherine@bccaustin.com

*Attorneys for Plaintiff*